FINER FOODS SALES CO., INC., Petitioner,

v.

John R. BLOCK, Secretary of Agriculture, United States Department of Agriculture, and United States of America, Respondents.

No. 82–1843.

United States Court of Appeals, District of Columbia Circuit.

Argued March 16, 1983.

Decided May 27, 1983.

John H. Vetne, Washington, D.C., for petitioner.

Thomas D. Edmondson, Atty., Dept. of Agriculture, Washington, D.C., with whom James Michael Kelly, Associate Gen. Counsel, and Raymond W. Fullerton, Asst. Gen. Counsel, Washington, D.C., were on the brief, for respondents.

Before WILKEY and GINSBURG, Circuit Judges, and FRIEDMAN,* Circuit Judge, United States Court of Appeals for the Federal Circuit.

Opinion for the Court filed by Circuit Judge FRIEDMAN.

FRIEDMAN, Circuit Judge:

This is a petition for review of a decision of the Secretary of Agriculture that the petitioner, Finer Foods Sales Co., Inc., a licensee under the Perishable Agricultural Commodities Act, 7 U.S.C. §§ 499a–499s (1976 & Supp. V 1981) ("Act"), was guilty of "flagrant and repeated" violations of the Act. The effect of that determination is to prohibit any person "responsibly connected" with the petitioner from working for another licensee for at least a year. We affirm.

## I.

The Perishable Agricultural Commodities Act requires persons who buy or sell significant quantities of perishable agricultural commodities at wholesale in interstate commerce to have a license issued by the Secretary of Agriculture. 7 U.S.C. § 499c (1976). The Act subjects licensees to various requirements and prohibitions. Section 2(4) of the Act, 7 U.S.C. § 499b(4) (1976), the provision here involved, makes it unlawful for any licensee "to fail or refuse truly and correctly to account and make full payment promptly in respect of any transaction in any such commodity to the person with whom such transaction is had."

The petitioner was a licensee under the Act. It was first licensed in 1977, and its license was renewed annually until 1980. The Judicial Officer of the Department of Agriculture, to whom the Secretary has delegated his adjudicatory functions under the Act (7 C.F.R. § 2.35 (1982)), found that "[a]t the time of its licensing in 1977 [the petitioner] was fully advised of the ... responsibilities of licensees under the Act to make full and prompt payment for its perishable agricultural commodities purchases."

In January 1978, the petitioner obtained a revolving loan from the BVA Credit Corporation ("BVA"), a division of the Bank of Virginia. The loan was computed on a daily basis, and was secured, apparently, by a pledge of the petitioner's accounts receivable and inventory.

In February 1979, Paris Foods sold and delivered to the petitioner two shipments of green beans at an invoice price of $27,257. When Paris Foods had not been paid by May, it submitted an informal complaint to the Department of Agriculture, which notified the petitioner of the complaint. The latter admitted its indebtedness and agreed to pay the amount due in two installments. The petitioner sent its check for the first installment of $14,000 in June, as agreed.

Before the check was presented for payment, however, BVA had taken possession of the petitioner's assets and "frozen" its bank account. It took this action the day after the petitioner's president had told BVA that his company was considering making an assignment for the benefit of creditors. Several days later the petitioner made the assignment.

As a result of BVA's "freezing" of the petitioner's bank account, the petitioner's $14,000 check to Paris Foods was not paid. Paris Foods notified the Department of the default, and the Department began an in-

---

* Sitting by designation pursuant to 28 U.S.C. § 291(a).

vestigation of the reasons for nonpayment. Upon ascertaining that the petitioner had made an assignment for the benefit of creditors and was insolvent, the investigator reviewed the petitioner's books and records and discovered that the petitioner had made 23 other purchases of perishable agricultural commodities for which it had not paid. These debts, which involved transactions over a period of almost five months, covered 18 transactions with one seller totaling approximately $21,000 and five transactions with another seller totaling approximately $27,000.

After it learned of the petitioner's insolvency, the Department began a formal reparations proceeding on behalf of Paris Foods against the petitioner. In its answer to the reparations complaint, the petitioner admitted that it owed the money as alleged. On February 12, 1980, the Judicial Officer entered an order concluding that the petitioner had violated section 2 of the Act and directing the petitioner to pay Paris Foods $27,257 within 30 days.

Four days earlier the insolvency trustees of the petitioner, following their sale of the petitioner's assets, had made a seven percent pro rata payment to all the creditors, including Paris Foods. The latter never received any additional payments under the reparations order.

On January 24, 1980, the Secretary issued a formal disciplinary complaint against the petitioner based upon the 24 transactions in which the petitioner had failed to pay its debts. After a hearing, the Administrative Law Judge issued a recommended decision that the petitioner had violated the Act and that its license should be revoked.

The petitioner appealed the decision to the Judicial Officer, who in June 1982 upheld the finding of violation. He held that the petitioner's failure to make payment in the 24 transactions constituted "flagrant and repeated violations of the Act and the Regulations." The Judicial Officer further ruled that because the petitioner's officials had acted with "full knowledge of what they were doing," the violations were "willful" under the Administrative Procedure Act.

The Judicial Officer modified the recommended order by eliminating the provision revoking the petitioner's license. He did so because the license had expired, the petitioner was insolvent, and it was no longer actively involved in a business the Act covered. In these circumstances, he concluded, revocation would be a meaningless act. He ordered, however, publication of the finding that the petitioner flagrantly and repeatedly had violated the Act. Publication of the Judicial Officer's decision would have the same effect as a license revocation upon the ability of certain officials of the petitioner to be employed by other licensees. *See infra* pp. 782–783.

II.

The petitioner does not challenge the Judicial Officer's determination that its failures over a five-month period to pay $75,000 due on 24 transactions were "flagrant and repeated violations" of the Act. It argues only that in reaching that decision the Judicial Officer violated procedural requirements of the Administrative Procedure Act and the Perishable Agricultural Commodities Act, that he improperly failed to consider mitigating circumstances, and that he should have excepted the current employment of the petitioner's president from the statutory bar upon employment by other licensees of persons "responsibly connected" with the petitioner.

III.

A. Section 9(c) of the Administrative Procedure Act, 5 U.S.C. § 558(c) (1976), provides that "[e]xcept in cases of willfulness . . .," a license may not be revoked unless the licensee has been given "(2) opportunity to demonstrate or achieve compliance with all lawful requirements." The petitioner contends that the Secretary violated this provision because he did not give the petitioner the opportunity to show or achieve compliance with section 2(4) of the Perishable Agricultural Commodities Act before instituting the disciplinary proceeding. The Judicial Officer correctly held, however,

that the petitioner's violations were willful, so that the opportunity-to-comply requirement of section 9(c) was inapplicable.

■ "Under [the Perishable Agricultural Commodities Act], an action is willful if a prohibited act is done intentionally, irrespective of evil intent, or done with careless disregard of statutory requirements." *American Fruit Purveyors, Inc. v. United States*, 630 F.2d 370, 374 (5th Cir.1980). *See also George Steinberg & Son, Inc. v. Butz*, 491 F.2d 988, 994 (2d Cir.), *cert. denied*, 419 U.S. 830, 95 S.Ct. 53, 42 L.Ed.2d 55 (1974). The Judicial Officer had ample basis for concluding that the petitioner's violations of the Act were willful.

As noted, the Judicial Officer found that when the petitioner received its license in 1977, it was "fully advised of the ... responsibilities of licensees under the Act to make full and prompt payment for its perishable agricultural commodities purchases." He further found that the petitioner's officers "were fully aware of the potential for non-payment which was a condition pregnant in the loan agreement" with BVA, and "had full knowledge of what they were doing." When the loan was negotiated, the officers were aware of the somewhat precarious financial condition of petitioner, which "had been losing money since fiscal year 1977."

The petitioner knew that under the loan agreement BVA could and was likely to take possession of the petitioner's assets, including its bank account, if it appeared that the petitioner was in sufficient financial trouble to raise doubts about its ability to repay the loan. That was precisely what happened when BVA foreclosed on the collateral the day after the petitioner's president told the lending institution that the petitioner was considering making an assignment for the benefit of creditors.

Despite the petitioner's awareness of (1) the statutory requirement of full and prompt payment, (2) the likelihood that BVA would foreclose on its collateral if it believed that its loan was threatened, and (3) the company's serious financial problems, the petitioner continued to purchase perishable agricultural commodities. As the Judicial Officer pointed out: "All of the ... transactions involved in this case were entered into well after [the petitioner] knew it was having great difficulty paying its bills." The petitioner's failure to pay was willful because it was "done with careless disregard of statutory requirements." *American Fruit Purveyors*, 630 F.2d at 374. When the petitioner made the purchases involved in this case, it necessarily knew that it probably would not be able to pay for them in accordance with the statutory requirement.

■ The petitioner argues, however, that the Secretary's action was impermissible because, prior to instituting the disciplinary proceeding, he did not make a formal determination of willfulness. Nothing in the Administrative Procedure Act imposes that requirement or supports the petitioner's apparent contention that the determination of willfulness itself may be made only after a hearing. If in fact the violations were willful, the requirement in section 9(c)(2) of opportunity for correction of the violations is inapplicable. When the Secretary instituted the disciplinary proceeding without first giving the petitioner the opportunity to cure the violation, necessarily he determined that the violations were willful. Since at that time he already knew the extent and character of the violations, he had an adequate basis for making that determination.

Indeed, it is difficult to see how giving the petitioner the opportunity to cure its violations could have helped it. Long before the Secretary initiated the disciplinary proceedings, the petitioner had become hopelessly insolvent. Upon the sale of the petitioner's assets, the proceeds enabled the insolvency trustees to pay the petitioner's creditors only seven percent on their claims. When the Secretary instituted the disciplinary proceedings, the violations long since had been committed. Even assuming *arguendo* that so belated a payment could constitute compliance, the petitioner could not have paid the debts at the time the complaint was filed.

B. The petitioner contends that because the Judicial Officer signed the reparations order, he was barred by section 5(d) of the Administrative Procedure Act, 5 U.S.C. § 554(d) (1976), from deciding the disciplinary case. Insofar as here pertinent, that section provides that an employee

> engaged in the performance of investigative or prosecuting functions for an agency in a case may not, in that or a factually related case, participate or advise in the decision ... except as witness or counsel in public proceedings.

The petitioner's theory apparently is that the signing of the reparations order by the Judicial Officer constituted "the performance of investigative or prosecuting functions" and that since the disciplinary proceeding was "a factually related case," section 5(d) precluded him from participating in the disciplinary case.

As the Judicial Officer stated in denying the petitioner's motion that he disqualify himself in the disciplinary proceeding, the motion was "based on a misconception as to how reparations dockets are handled in practice." He described that practice as follows:

> Reparation orders are prepared for the signature of the Judicial Officer by the Office of the General Counsel, and after review by the Regulatory Branch, they are filed with the Hearing Clerk. The Judicial Officer discusses the matter with the attorneys or administrative officials only if there is a dispute between them or if the Judicial Officer, *sua sponte,* disagrees with the proposed order. In practice, there is rarely a dispute between the administrative officials and the attorneys, and the Judicial Officer rarely disagrees with the proposed order. In fact, such disagreements or disputes occur in perhaps one or two cases out of some 300 cases handled each year . . . .
>
> . . . In such cases [*i.e.,* where there is no disagreement or dispute], it is the practice of the Judicial Officer (i) not to read the names of the parties, and, therefore, the Judicial Officer has no recollection of ever having signed a reparation order involving the respondent; (ii) not to read the findings of fact in the case; (iii) not to read the entire conclusions. Instead, he skims the conclusions looking for points of law. In a typical case, he spends approximately 30 seconds reviewing and signing the decision.

In signing the reparations order, the Judicial Officer did not perform any "investigative or prosecuting" function. He merely performed a ministerial act that did not involve him in the merits of the reparations case, in which the petitioner had admitted liability and there was nothing in controversy. In that situation the issuance of an order directing the petitioner to repay the amount admittedly owed was a routine task that did not require the Judicial Officer to exercise any discretion or make any legal or factual judgments.

The petitioner argues, however, that the Judicial Officer received advice concerning the reparations order from other Department employees who themselves were involved in prosecuting the reparations case, and that the receipt of such advice itself constituted the performance of an investigative or prosecuting function. There is nothing in the record that supports the petitioner's claim that Department officials had such ex parte contact with the Judicial Officer. Indeed, the Judicial Officer stated exactly the opposite in denying the motion for his disqualification: "In the *Finer Foods* case, there was no disagreement or dispute, and there was no discussion between the Judicial Officer and the attorneys or the administrative official." The Department attorneys' preparation of the order, which the Judicial Officer routinely signed, did not amount to the performance of an investigative or prosecuting function by the Judicial Officer that under section 5(d) barred him from subsequently deciding the factually related disciplinary case.

The petitioner seemingly suggests that the alleged commingling of investigative or prosecuting functions with the decision function in the Judicial Officer denied it procedural due process. Our holding that the Judicial Officer's ministerial participa-

tion in the reparations proceeding did not bar him under section 5(d) from deciding the disciplinary case also requires rejection of the constitutional claim. As this court has noted:

> [A]s to adjudications, the combination in one administrative body of adjudicative with other functions violates constitutional guarantees only when the combination "poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented." *Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975). Any claim of inherent bias must "overcome a presumption of honesty and integrity in those serving as adjudicators." *Withrow v. Larkin,* 421 U.S. at 47, 95 S.Ct. at 1464.

*Porter County Chapter of the Izaak Walton League v. Nuclear Regulatory Comm'n,* 196 U.S.App.D.C. 456, 464, 606 F.2d 1363, 1371 (1979) (citations omitted).

There is nothing in the record that even suggests any constitutional defect in the Judicial Officer's decision of the disciplinary proceeding following his signing of the reparations order.

## IV.

■ The petitioner contends that the Secretary violated section 6 of the Perishable Agricultural Commodities Act, 7 U.S.C. § 499f (1976). According to the petitioner, the Secretary cannot issue a formal disciplinary complaint against a licensee unless the aggrieved party previously filed with the Secretary an informal complaint seeking such action, and that informal complaint was served on the licensee. The Judicial Officer correctly rejected this contention on the ground that the statutory provision upon which the petitioner relies to establish this alleged requirement applies only to reparations proceedings and not to disciplinary proceedings.

The first three subparagraphs of section 6 contain the pertinent provisions:

Section 6(a) permits "[a]ny person complaining of any violation of any provision of section [2, 7 U.S.C. §] 499b [, which defines illegal practices by licensees, including the failure to pay promptly involved here,] ... by any [licensee] [to] apply to the Secretary by petition ... whereupon, if, in the opinion of the Secretary, the facts therein contained warrant such action, a copy of the complaint thus made shall be forwarded by the Secretary to the [licensee], who shall be called upon to satisfy the complaint, or to answer it in writing."

Section 6(b) authorizes state and territorial officials having jurisdiction over licensees, any employee of the Department of Agriculture, "or any interested person" to file with the Secretary "a complaint of any violation of any provision of this chapter" by any licensee and to "request an investigation of such complaint by the Secretary."

Section 6(c) provides that, if reasonable grounds appear to the Secretary "for investigating any complaint made under this section, the Secretary shall investigate such complaint and may, if in his opinion the facts warrant such action," serve the complaint "on the person concerned and afford such person an opportunity for a hearing thereon."

These subsections do not expressly state which of them applies to reparations proceedings, which to disciplinary proceedings, and which to both. Analysis of their language and structure, however, indicates that the requirement in section 6(a) for the filing and serving upon the licensee of an informal complaint of a third person—the provision upon which the petitioner rests its argument that the Secretary violated section 6—applies only in reparations proceedings and not in disciplinary proceedings.

The purpose of a reparations proceeding is to require the licensee to satisfy a monetary claim against him. If the Secretary concludes that an informal reparations complaint filed with him has merit, he is required to forward a copy to the licensee, who shall be "called upon to satisfy the complaint, or to answer it in writing." This provision is designed to give the licensee the opportunity through an informal proceeding to pay the amount due or to explain the

situation, and thus to avoid a formal disciplinary proceeding with the likelihood of sanctions. The informal complaint that section 6(a) authorizes covers only violations of section 2 of the Act, which defines the unfair practices by licensees that the Act prohibits.

In contrast, section 6(b) authorizes a broad group of persons to file with the Secretary "a complaint of any violation of any provision of" the Act by a licensee and to "request an investigation of such complaint by the Secretary." Nothing in this subsection provides for service of the complaint upon the licensee to give it the opportunity "to satisfy the complaint," as section 6(a) mandates. The only situation in which the Act may require the filing and service upon the licensee of an informal complaint is where the aggrieved party has filed an informal reparations claim.

The Secretary's regulations support this interpretation of the Act. They provide that on the basis of an informal complaint the Secretary may initiate an investigation, which may result in either a reparations proceeding or a disciplinary action. 7 C.F.R. § 47.3(b)(1) (1983). Where the Secretary receives an informal complaint from an aggrieved party and determines that further action is warranted, the Director of the Fruit and Vegetable Division of the Department's Agricultural Marketing Service, "in an effort to effect an amicable or informal adjustment of the matter, shall give written notice to the person complained against of the facts or conduct concerning which complaint is made." *Id.* § 47.3(b)(2). This requirement is not included in the regulations governing disciplinary complaints. *See* 7 C.F.R. § 1.130–1.-151 (1982).

Section 6(c) specifies the procedure the Secretary is to follow if he decides to institute a formal reparations or disciplinary proceeding as a result of a complaint filed with him. If he takes that action, the formal complaint must be "served by registered mail or by certified mail" upon the licensee, who has "an opportunity for a hearing thereon." (In contrast, section 6(a) requires only that the informal complaint be "forwarded" to the licensee.)

The Secretary concededly complied with the procedures section 6(c) requires for a formal disciplinary proceeding. The disciplinary complaint was served upon the petitioner, which received a hearing on the violations before an Administrative Law Judge. The Act required no more. Petitioner gives no convincing reason why the informal complaint procedure for reparations cases, which serves the important practical purpose of enabling the licensee to satisfy its obligation informally, should be applied to the quite different situation in which the Secretary has initiated formal disciplinary action.

V.

The petitioner argues that the Judicial Officer improperly refused to consider various "mitigating factors" that, according to it, should have been viewed as excusing its failure to pay its debts. These include the allegedly relatively small amount the petitioner owed, the absence of previous violations by the petitioner, and the lack of "devious or dishonest practices by the petitioner." In refusing to consider these factors, the Judicial Officer pointed out that "it has repeatedly been held under the Act that all excuses are routinely rejected in determining whether payment violations occurred or whether violations were wilful since 'the Act calls for payment—not excuses.'" *Quoting In re Kafcsak,* 39 Agric.Dec. 683, 686 (1980). *See also In re Carlton F. Stowe, Inc.,* 41 Agric.Dec. 1116, 1129 (1982).

The Judicial Officer properly interpreted the Act. Section 2(4), 7 U.S.C. § 499b(4) (1976), is unequivocal. It makes it unlawful for a licensee to "fail or to refuse . . . to . . . make full payment promptly." As Congress noted in amending the Act in 1956, "The Perishable Agricultural Commodities Act is admittedly and intentionally a 'tough' law." S.Rep. No. 2507, 84th Cong., 2d Sess. (*citing* H.Rep. No. 1196, 84th Cong., 1st Sess.), *reprinted in* 1956 U.S.Code Cong. & Ad.News 3699, 3701. The Secretary explained the reason for this strict

requirement in *In re Columbus Fruit Co.*, 40 Agric.Dec. 109, 114 (1981), *aff'd mem.* 41 Agric.Dec. 89 (D.C.Cir. No. 81–1446, Jan. 19, 1982):

> Failure to pay violations not only adversely affect the party who is not paid for produce, but such violations have a tendency to snowball. "On occasions, one licensee fails to pay another licensee who is then unable to pay a third licensee." This could have serious repercussions to producers, licensees and consumers.

*Quoting In re John H. Norman & Sons Distrib. Co.*, 37 Agric.Dec. 705, 720 (1978).

In sum, the "goal of the [Perishable Agricultural] Commodities Act [is] that only financially responsible persons should be engaged in the businesses subject to the Act." *Zwick v. Freeman*, 373 F.2d 110, 117 (2d Cir.), *cert. denied*, 389 U.S. 835, 88 S.Ct. 43, 19 L.Ed.2d 96 (1967) *quoted in Marvin Tragash Co. v. United States Dep't of Agric.*, 524 F.2d 1255, 1257 (5th Cir.1975).

The strict policy of the Secretary that all excuses for nonpayment are disregarded furthers this goal. Under the Act a licensee is required to conduct his business in a manner that insures that he pays his bills fully and promptly. If he fails to do so, he violates the Act. For this reason, alleged mitigating circumstances are irrelevant.

The one extenuating circumstance the Judicial Officer did consider was the petitioner's point that the creditors had accepted the insolvency trustees' distribution of seven percent of their claim "in full satisfaction" of those debts. Such a belated payment of a small portion of a licensee's obligation does not constitute the making of the "full payment promptly" that section 2(4) requires. *Marvin Tragash Co.*, 524 F.2d at 1258.

## VI.

Finally, the petitioner argues that the Judicial Officer should have taken action to avoid the bar the Act may place upon the employment of the petitioner's former president by other licensees.

Section 8(b) of the Act, 7 U.S.C. § 499h(b) (1976), bars any licensee from employing, without the approval of the Secretary, "any person who is or has been responsibly connected with any person . . . (2) who has been found . . . to have committed any flagrant or repeated violation of section 2 [7 U.S.C. § 499b] . . . . The Secretary may approve such employment . . . after one year following the . . . finding of flagrant or repeated violation" if the licensee furnishes a surety bond, and after two years if he does not. Because the Judicial Officer found that the petitioner committed flagrant and repeated violations of section 2(4) (7 U.S.C. § 499b(4)), the effect of section 8(b) is to bar from employment by a licensee for at least one year any person who was "responsibly connected" with the petitioner.

After the petitioner made its assignment for the benefit of creditors, its assets were sold to Sandler Foods, another licensee under the Act, which employed the petitioner's former president, Melvyn Siegel. The record does not show the nature of Mr. Siegel's work with Sandler Foods. The petitioner states, however, that only three to five percent of Sandler Foods' business is in perishable agricultural commodities—the same percentage of such business that the petitioner did—and that Mr. Siegel does not handle any of that business. For these reasons, the petitioner contends that Mr. Siegel should not be subject to the statutory bar upon his employment by Sandler Foods.

The jurisdiction of this court is invoked under 28 U.S.C. § 2344 (1976), which authorizes "[a]ny party aggrieved" by a final order to seek judicial review. Mr. Siegel is not a party to these review proceedings. Only the petitioner is. The petitioner, which is a corporation, has not shown how it has been or could be aggrieved by any bar upon the employment of its former president by another licensee. The petitioner was aggrieved by the Judicial Officer's findings that it had committed flagrant and repeated violations of the Act, and that is the only determination it has standing to challenge in this court.

Mr. Siegel or his new employer, but not the petitioner, may challenge the effect of the determination of the petitioner's violations upon Mr. Siegel's employment with another licensee. There is a procedure by which this may be done, and that is the proper method by which the issue may be litigated and determined.

As noted, it is the statute that may bar Mr. Siegel's employment with another licensee. The Judicial Officer's decision merely triggered that bar. The bar, however, is not self-executing but requires further action by the Secretary before it becomes effective.

The Secretary's regulations provide that following an administrative determination that a person was "responsibly connected" with a licensee subject to a disciplinary order, the Department will so advise the person in writing. 7 C.F.R. § 47.49 (1983). Upon the receipt of such notice the person may obtain a hearing to determine that question. *Id.* After the hearing, the presiding officer renders a decision. *Id.* § 47.-62. Either party may appeal to the Administrator of the Agricultural Marketing Service, who issues the final order. *Id.* § 47.-63–47.64. That order is judicially reviewable. 28 U.S.C. § 2342(2) (1976); *Quinn v. Butz,* 166 U.S.App.D.C. 363, 510 F.2d 743 (1975).

If, as seems likely, the Department initially determines that Mr. Siegel was "responsibly connected" with the petitioner and therefore is barred from employment with another licensee, and so notifies him, he can then obtain a hearing. At that hearing Mr. Siegel may litigate the question whether he was "responsibly connected" with the petitioner, and he "may also raise any other factual, legal, or constitutional arguments pertinent to the proposed penalty, when and if such penalty is sought by the Secretary." *Marvin Tragash Co.,* 524 F.2d at 1258–59.

That administrative proceeding is the proper forum in which all aspects of Mr. Siegel's relationships with the petitioner and with Sandler Foods can be explored. On the basis of the information developed at the hearing, the Secretary can then make an informed determination whether the statutory bar against employment by another licensee properly is applicable to Mr. Siegel. The question of the bar, however, is not an issue in the present disciplinary proceeding, in which the question is whether the petitioner violated section 2(4). *See George Steinberg & Son, Inc. v. Butz,* 491 F.2d 988, 994 (2d Cir.), *cert. denied,* 419 U.S. 830, 95 S.Ct. 53, 42 L.Ed.2d 55 (1974). The Judicial Officer properly refused to consider the issue of Mr. Siegel's employment.

The order of the Judicial Officer is

*Affirmed.*