JSG TRADING CORP., Petitioner,

v.

UNITED STATES DEPARTMENT OF AGRICULTURE and United States of America, Respondents.

No. 98–1342.

United States Court of Appeals, District of Columbia Circuit.

Argued April 28, 1999.

Decided May 25, 1999.

Robert M. Adler argued the cause for petitioner. With him on the briefs were Gary C. Adler and John M. Himmelberg.

M. Bradley Flynn, Attorney, U.S. Department of Agriculture, argued the cause for respondents. With him on the brief were James Michael Kelly, Associate General Counsel, and Margaret M. Breinholt, Acting Assistant General Counsel. Michael E. Robinson and Robert S. Greenspan, Attorneys, U.S. Department of Justice, entered appearances.

Before: EDWARDS, Chief Judge, GARLAND, Circuit Judge, and BUCKLEY, Senior Circuit Judge.

Opinion for the Court filed by Chief Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Chief Judge:

On an appeal from a decision of an Administrative Law Judge ("ALJ"), a Judicial Officer of the United States Department of Agriculture ("USDA") determined that petitioner JSG Trading Corporation ("JSG") had violated § 2(4) of the Perishable Agricultural Commodities Act ("PACA" or "Act"), 7 U.S.C. § 499b(4), by making a series of payments to the purchasing agents of two separate tomato buyers, L&P Fruit Corporation ("L&P") and American Banana, at a time when those agents were buying tomatoes from JSG on behalf of their respective employers. The Judicial Officer subsequently revoked JSG's license to deal in perishable agricultural commodities.

In this petition for review, JSG challenges the revocation of its license, alleging that the Judicial Officer was proceeding from an incorrect legal premise, namely, that *any* payment by a produce dealer to a purchasing agent above a *de minimis* level constitutes "commercial bribery" in violation of § 2(4) of PACA. JSG argues that this *per se* standard represents a marked departure from prior agency precedent, and that the case should be remanded for factual findings in accordance with the correct legal standard.

We agree that, in adopting a *per se* standard to measure commercial bribery, the Judicial Officer departed from well established precedent without adequate justification. We therefore remand the case to the agency, so that it may either attempt to justify its creation of a new, *per se* standard or make explicit factual findings pursuant to established law.

## I. BACKGROUND

### A. Statutory and Regulatory Background

"Congress enacted PACA in 1930 in an effort to assure business integrity in an industry thought to be unusually prone to fraud and to unfair practices." *Tri-County Wholesale Produce Co. v. USDA*, 822 F.2d 162, 163 (D.C.Cir.1987). A later Congress summarized the purpose of PACA as follows:

[PACA] is admittedly and intentionally a "tough" law. It was enacted in 1930 for the purpose of providing a measure of control and regulation over a branch of industry which is engaged almost exclusively in interstate commerce, which is highly competitive, and in which the opportunities for sharp practices, irresponsible business conduct, and unfair methods are numerous. The law was designed primarily for the protection of the producers of perishable agricultural products—most of whom must entrust their products to a buyer or commission merchant who may be thousands of miles away, and depend for their payment upon his business acumen and fair dealing—and for the protection of consumers who frequently have no more than the oral representation of the dealer that the product they buy is of the grade and quality they are paying for.

S.Rep. No. 84-2507, at 3 (1956), U.S.Code Cong. & Admin. Serv.1956, pp. 3699, 3701. "[T]he goal of ... [PACA is] that only financially responsible persons should be engaged in the businesses subject to the Act." *Finer Foods Sales Co. v. Block,* 708 F.2d 774, 782 (D.C.Cir.1983) (citations and internal quotation marks omitted). To achieve this end, the Act requires persons who buy or sell significant quantities of perishable agricultural commodities at wholesale in interstate commerce to have a license issued by the Secretary of Agriculture. *See* 7 U.S.C. § 499c.

Section 2 of the Act makes unlawful a number of activities by licensees. *See id.* § 499b. Relevant here is § 2(4), which makes it unlawful for any commission merchant, dealer, or broker, in any transaction involving any perishable agricultural commodity, to, *inter alia*, "fail, without reasonable cause, to perform any specification or duty, express or implied, arising out of any undertaking in connection with any such transaction." *Id.* § 499b(4).

In 1995, PACA was amended to establish that certain payments were not illegal under § 2(4). Specifically, the following sentence was added to § 2(4):

However, this paragraph shall not be considered to make the good faith offer, solicitation, payment, or receipt of collateral fees and expenses, in and of itself, unlawful under this chapter.

Perishable Agricultural Commodities Act Amendments of 1995, Pub.L. No. 104–48, § 9(b)(3), 109 Stat. 424, 430 (1995) (codified as amended at 7 U.S.C. § 499b(4)). The term "collateral fees and expenses" was defined as

any promotional allowances, rebates, service or materials fees paid or provided, directly or indirectly, in connection with the distribution or marketing of any perishable agricultural commodity.

Pub.L. No. 104–48, § 9(a), 109 Stat. 424, 429–30 (1995) (codified as amended at 7 U.S.C. § 499a(b)(13)).

Upon a determination that a commission merchant, dealer, or broker has violated one of the provisions of § 2, the Act authorizes the Secretary of Agriculture to publish the facts and circumstances of the violation, and suspend the offender's PACA license for up to ninety days. *See* 7 U.S.C. § 499h(a). The Secretary may revoke the license if the violation is "flagrant or repeated." *Id.*

### B. Factual Background

JSG is a New Jersey corporation in the business of buying and selling produce. In 1988, JSG was issued a PACA license, and that license was renewed annually thereafter. Beginning in January 1992, Steve Goodman served as JSG's president and controlled 75 percent of the company's stock. At all relevant times, Mr. Goodman was JSG's sole tomato buyer and seller. The transactions giving rise to the commercial bribery charges in this case originated from JSG's relationships with two tomato purchasers, L&P and American Banana, both produce dealers located at the Hunts Point Market in Bronx, New York.

The purchasing agents in the disputed L&P transactions were Tony and Gloria Gentile. Mr. Goodman and Mr. Gentile, as well as their families, apparently enjoyed a close social relationship. Long before any of the questioned transactions occurred— in fact, before Mr. Goodman had any relationship at all with JSG—Mr. Gentile taught Mr. Goodman the tomato business. The Goodman and Gentile families spent a great deal of time together, often dining out and going to shows in Atlantic City.

Mr. Gentile, who was the head tomato buyer for L&P from 1985 through 1991, had a joint account arrangement with L&P, whereby he would share profits and losses with L&P on the tomatoes that he purchased. Such joint accounts apparently are common in the New York produce industry. During the time that Mr. Gentile served as a buyer for L&P, he purchased tomatoes from JSG, as well as from other sellers.

In 1989, Mr. Goodman and Mr. Gentile formed a trucking company called Dirtbag Trucking Corp. ("Dirtbag"), and each was issued 75 shares of Dirtbag stock. Dirtbag, which operated out of JSG's office, always had a cash flow problem, and JSG advanced money to it on a number of occasions. Although JSG was Dirtbag's primary customer, Dirtbag also provided trucking services to other produce companies.

The purchasing agent in the questioned transactions with American Banana was Al Lomoriello. American Banana hired Mr. Lomoriello in 1991, on a joint account basis similar to L&P's arrangement with Mr. Gentile. According to Mr. Goodman and Mr. Lomoriello, Mr. Lomoriello sometimes provided various services to JSG, including delivering produce, collecting accounts receivable, and providing Mr. Goodman with pricing information on produce and market supplies.

## C. Procedural Background

In January 1993, the USDA received a telephone complaint about JSG. The call-er said that Mr. Goodman had been making payments to Mr. Gentile while Mr. Gentile was buying tomatoes for L&P. The USDA assigned two investigators to audit JSG, and a formal PACA complaint was eventually brought against JSG, the Gentiles, and Mr. Lomoriello. The complaint alleged that the respondents had "engaged in a scheme" whereby JSG made payments to the Gentiles and Mr. Lomoriello "to induce [them] to purchase tomatoes from ... JSG on behalf of [L&P and American Banana, respectively]." Amended Complaint ¶¶ 6–7, *reprinted in* Joint Appendix ("J.A.") 10–11. On June 17, 1997, after a lengthy hearing, the ALJ determined that the respondents had committed wilful, flagrant, and repeated violations of § 2(4). *See In re JSG Trading Corp.,* PACA Docket Nos. D–94–0508, D–94–0526 (June 17, 1997), at 46–47 ("ALJ Decision"), *reprinted in* J.A. 61–62. The ALJ found that, during the time that Mr. Gentile was buying tomatoes from JSG on behalf of L&P, Mr. Goodman and JSG made payments and transferred items of value to the Gentiles. Similarly, the ALJ found that JSG had made a series of payments to Mr. Lomoriello, while Mr. Lomoriello was buying tomatoes from JSG on behalf of American Banana. The ALJ identified seven transactions that he considered illegal bribes. We summarize them as follows:

### 1. The Boat

Mr. Goodman bought a boat in 1987 for approximately $47,000. Beginning in late 1990, he allowed Mr. Gentile to use the boat with the understanding that Mr. Gentile would pay for the boat's upkeep and maintenance. In late 1992, Mr. Goodman sold the boat to Mr. Gentile for $10,000. It is undisputed that Louis Beni, L&P's secretary-treasurer and 35 percent owner, was aware of the purchase. In fact, Mr. Gentile told Mr. Beni that he had gotten a good deal on the boat. Two years later, after he had spent approximately $7000 in

repairs, Mr. Gentile sold the boat for approximately $20,000.

## 2. The Car

In 1990, a 1990 model Mercedes 300 SEL car was leased to Mr. Gentile for 48 months. The lease was authorized through Dirtbag, although, as with many of Dirtbag's creditors, some of the lease was paid for by JSG. Mr. Goodman testified that he gave the car to Mr. Gentile for him to drive while doing work for Dirtbag. When the car was presented to Mr. Gentile, Mr. Goodman placed a red ribbon on it. It is undisputed that Mr. Gentile's superiors at L&P knew about the car, and knew about Mr. Gentile's association with Mr. Goodman and Dirtbag. Despite Mr. Goodman's and Mr. Gentile's testimony as to the work Mr. Gentile did for Dirtbag, the ALJ found it "doubtful" that Mr. Gentile used the car for Dirtbag business, concluding rather that the car was probably a gift from Mr. Goodman to Mr. Gentile. *See* ALJ Decision at 23–24, *reprinted in* J.A. 38–39.

## 3. The Watch

In July 1992, Mr. Goodman purchased a $3000 Rolex watch and gave it to Mr. Gentile as a gift. Mr. Goodman testified that he gave the watch to Mr. Gentile partly as a birthday present, partly as a present to celebrate Mr. Gentile's recovery from cancer, and partly in appreciation for Mr. Gentile's willingness to teach him about the tomato business. Mr. Gentile wore the watch openly, and it is undisputed that Mr. Beni knew about the gift.

## 4. The Stock Sale

When he was diagnosed with cancer, Mr. Gentile transferred his 75 shares of Dirtbag stock to Mrs. Gentile. In February 1991, Mrs. Gentile entered into a written agreement to sell her 75 shares of Dirtbag to Mr. Goodman for $80,000. The agreement provided that upon final payment, a loan of $40,000 from Mr. Gentile to Dirtbag would be released. There was also evidence that Mr. Gentile had invested an additional $7000 in Dirtbag for a new truck. The ALJ concluded that, because Dirtbag was an unprofitable company, Mr. Goodman had overpaid the Gentiles by at least $33,000 ($80,000 minus the $47,000 that Mr. Gentile had invested in Dirtbag). Neither party offered a valuation expert on this issue.

## 5. The Circular Checks

JSG issued 35 checks, totaling approximately $62,000, made payable to "A. Gentile." These checks were not deposited in a bank account controlled or owned by the Gentiles. Instead, they were endorsed in the name of "A. Gentile" by JSG's bookkeeper, and redeposited in a JSG account. Although the checks were "circular," in that they ended up back in JSG's account, the ALJ found that the checks were used in JSG's records to indicate that Mr. Goodman was sharing his profit with Mr. Gentile. *See* ALJ Decision at 30, *reprinted in* J.A. 45. Further, the ALJ found that sixteen of the checks were shown in JSG's records as reducing a loan that Mr. Gentile owed to JSG. *See id.*

## 6. The Payments to Mrs. Gentile

JSG also made several payments to Mrs. Gentile. According to Mr. Goodman and Mrs. Gentile, the payments were for services rendered to JSG by Mrs. Gentile. Specifically, Mrs. Gentile testified that, at Mr. Goodman's request, she checked tomatoes at Florida packing houses and gave reports on her findings to Mr. Goodman. The ALJ, however, relying primarily on the fact that there was no written agreement between Mr. Goodman and Mrs. Gentile, found the payments to be bribes rather than compensation for services rendered.

## 7. The Payments to Mr. Lomoriello

From December 1992 through February 1993, a period during which Mr. Lomoriello was responsible for buying tomatoes on

behalf of American Banana, JSG issued seven checks to Mr. Lomoriello, totaling approximately $10,000. According to Mr. Goodman and Mr. Lomoriello, the payments were for various services Mr. Lomoriello rendered to JSG. American Banana's vice-president, Demetrius Contos, testified that he was aware that Mr. Lomoriello used his own truck during the evenings for his own business unrelated to American Banana. The ALJ, however, found that the payments were bribes, and cited evidence in JSG's records suggesting that Mr. Lomoriello was getting paid a certain amount for each box of tomatoes that JSG sold to American Banana.

After describing these seven payments, the ALJ interpreted prior agency precedent as dictating that "JSG could only make ... payments [to the Gentiles and Mr. Lomoriello] with its customers' [*i.e.,* L&P's and American Banana's] permission." ALJ Decision at 18, *reprinted in* J.A. 33. The ALJ concluded that "[e]ven if it received permission, JSG should not have made more than *de minimis* payments to Mr. Gentile and Mr. Lomoriello. These payments were more than *de minimis*. Therefore, these payments constituted commercial bribery, in violation of section 2(4) of the PACA." *Id.* The ALJ found that the PACA violations were "wilful, flagrant, and repeated," and ordered JSG's PACA license revoked. *Id.* at 46, *reprinted in* J.A. 61.

JSG and the Gentiles (but not Mr. Lomoriello) appealed the ALJ's decision to the Judicial Officer, to whom the Secretary has delegated authority as the final deciding officer in the agency's adjudicatory process. *See* 7 C.F.R. §§ 1.132, 2.35 (1998). On March 2, 1998, the Judicial Officer adopted, with minor and insignificant changes, the ALJ's factual and legal conclusions. *See In re JSG Trading Corp.,* PACA Docket Nos. D–94–0508, D–94–0526 (May 2, 1998), at 8 ("Judicial Officer Decision"), *reprinted in* J.A. 70. JSG filed a petition for reconsideration with the Judicial Officer, which was denied on June 1, 1998. *See In re JSG Trading Corp.,* PACA Docket Nos. D–94–0508, D–94–0526 (June 1, 1998), at 25 ("Reconsideration Order"), *reprinted in* J.A. 182. On July 30, 1998, the Judicial Officer issued a stay of the order revoking JSG's license pending judicial review. JSG, alone, then petitioned this court for review of the Judicial Officer's final determination.

## II. ANALYSIS

### A. Standard of Review

■ This court has exclusive jurisdiction to review final orders of the USDA in disciplinary actions brought under PACA. *See* 28 U.S.C. § 2342(2). We review the agency's orders under the Administrative Procedure Act's ("APA") arbitrary and capricious standard. That is, we will uphold the Judicial Officer's decision unless we find it to be arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence. *See* 5 U.S.C. § 706(2)(A), (E).

### B. The Prohibition Against Commercial Bribery Under PACA

Section 2(4) of PACA does not, by its terms, proscribe "commercial bribery." Nevertheless, the agency has, on two previous occasions, interpreted the provision to cover activity that falls within the traditional definition of commercial bribery. *See In re Tipco, Inc.,* 50 Agric. Dec. 871, 1991 WL 295153 (1991), *aff'd per curiam, Tipco, Inc. v. Yeutter,* 953 F.2d 639 (4th Cir.1992) (unpublished table decision), *available in* 1992 WL 14586; *In re Sid Goodman & Co.,* 49 Agric. Dec. 1169, 1990 WL 320442 (1990), *aff'd per curiam, Sid Goodman & Co. v. United States,* 945 F.2d 398 (4th Cir.1991) (unpublished table decision), *available in* 1991 WL 193489.

*Tipco* and *Goodman* involved very similar facts, as well as some of the same parties. In each case, a wholesale produce dealer paid the purchasing agents of a supermarket chain 25 cents per package of produce bought by the chain, in an effort

to induce the agents to buy from that dealer and not a competitor. The dealer then raised the price of each package by 25 cents, in order to cover the payment to the purchasing agents. The purchasing agents' employers—the supermarket chains—were unaware of the payments to their employees and the surcharge that they incurred. The payment schemes resulted in increased sales for the dealer, a kickback for the purchasing agents, and, of course, higher prices for the innocent supermarket chain. In each case, the agency brought complaints against the dealers under PACA, and eventually revoked their PACA licenses, citing flagrant and repeated violations of § 2(4).

In *Goodman,* the first PACA case ever to address allegations of commercial bribery, the Judicial Officer applied the following definition of commercial bribery:

> [T]he "offer of consideration to another's employee or agent in the expectation that the latter will, without fully informing his principal of the gift, be sufficiently influenced by the offer to favor the offeror over other competitors."

*In re Sid Goodman & Co.,* 49 Agric. Dec. 1169, 1184, 1990 WL 320442, at **10 (quoting 2 Rudolph Callman, THE LAW OF UNFAIR COMPETITION TRADEMARKS AND MONOPOLIES § 49 (3d ed.1968)). The Judicial Officer went on to make specific findings that the dealer made the payments with the intent to induce the purchasing agents to buy from that dealer as opposed to its competitors, *see Goodman,* 49 Agric. Dec. at 1187, 1990 WL 320442, at **12, and that the payments were made surreptitiously, *i.e.,* without the knowledge of the purchasing agents' employers, *see id.* at 1187–88, 1990 WL 320442, at **13.

In *Tipco,* the same Judicial Officer once again made specific findings of both intent to induce, *see Tipco,* 50 Agric. Dec. at 896, 1991 WL 295153, at **16, and secrecy, *see id.* at 899, 1991 WL 295153, at **18. Although he did not repeat the definition of commercial bribery that he had used in *Goodman,* the Judicial Officer in *Tipco*

made it clear that he was relying on the standard he had employed in the previous case. *See, e.g., id.* at 889, 1991 WL 295153, at **11 ("[T]he evidence of record is certain that licensee Tipco made surreptitious payments to its customer's employee to induce the employee to buy, or continue to buy, its produce, certainly, in derogation of its competitors. Under the precepts of the *Goodman* case, this is enough, in itself, for me to find that respondent Tipco deserves the same sanction for the same violation as found in the *Goodman* proceeding."). The Fourth Circuit, in unpublished dispositions, upheld the agency's interpretation of § 2(4) in both cases. *See Tipco, Inc. v. Yeutter,* 953 F.2d 639 (4th Cir.1992) (unpublished table decision), *available in* 1992 WL 14586; *Sid Goodman & Co. v. United States,* 945 F.2d 398 (4th Cir.1991) (unpublished table decision), *available in* 1991 WL 193489.

It is clear that the test for commercial bribery employed by the agency in *Goodman* and *Tipco* requires a finding of both intent to induce and secrecy. These requirements are not surprising, given that commercial bribery statutes typically contain at least these two elements. *See, e.g.,* N.Y. PENAL LAW §§ 180.00, 180.03 (McKinney 1999) ("A person is guilty of commercial bribing ... when he confers, or offers or agrees to confer, any benefit upon any employee, agent or fiduciary without the consent of the latter's employer or principal, with intent to influence his conduct in relation to his employer's or principal's affairs."); 720 ILL. COMP. STAT. ANN. 5/29A–1 (West 1998) ("A person commits commercial bribery when he confers, or offers or agrees to confer, any benefit upon any employee, agent or fiduciary without the consent of the latter's employer or principal, with intent to influence his conduct in relation to his employer's or principal's affairs."); *see also* 2 Rudolph Callman, THE LAW OF UNFAIR COMPETITION TRADEMARKS AND MONOPOLIES § 12.01, at 1 n.0.50; § 12.01, at 8–9 (4th ed.1996 & Supp.1999);

BLACK'S LAW DICTIONARY 270 (6th ed.1990) (defining commercial bribery as "[a] form of corrupt and unfair trade practice in which an employee accepts a gratuity to act against the best interests of his employer").

We do not disagree with the Fourth Circuit that the broad and ambiguous language of § 2(4) can be read to proscribe activity that falls within one of the traditional definitions of commercial bribery described above. Indeed, JSG concedes that commercial bribery is illegal under PACA. *See* Reply Brief of Petitioner at 4. The issue presented here is whether the agency applied the same commercial bribery standard in the instant case that it applied in both *Goodman* and *Tipco,* and, if not, whether it adequately explained its reasons for departing from prior agency precedent.

### C.  The Commercial Bribery Standard Applied in This Case

█   JSG argues that the agency in the instant case departed from the precedent established in *Goodman* and *Tipco* by applying a *per se* test for commercial bribery. The agency concedes that the Judicial Officer applied a *per se* test, which deems illegal any payment above a *de minimis* level from a produce dealer to a purchasing agent, regardless of whether there is any secrecy or intent to induce. Indeed, agency counsel stated at oral argument that "[t]here is no way of characterizing [the test employed by the Judicial Officer] any other way." Tr. of Oral Argument at 18. Agency counsel also conceded that, because he was employing a *per se* test, the Judicial Officer did not make explicit findings with respect to secrecy or intent to induce. *See id.* at 18, 19, 36. In fact, the Judicial Officer specifically found that Mr. Gentile's employer was aware of at least one of Mr. Goodman's gifts. *See, e.g.,* Judicial Officer Decision at 33, *reprinted in* J.A. 95 (finding that Mr. Beni was aware that Mr. Goodman had given Mr. Gentile a good deal on the boat). The

agency argues, however, that the Judicial Officer's use of the *per se* test was permissible under prior agency precedent. We disagree. It is clear here that the Judicial Officer adhered to a new definition of commercial bribery that finds no support in the case law; it is also clear that he offered no justification whatsoever either for his re-definition of commercial bribery or for the necessity of a *per se* test in this or any other case.

The Judicial Officer did purport to follow *Goodman* and *Tipco.* *See, e.g.,* Judicial Officer Decision at 90, *reprinted in* J.A. 155 ("[T]he legal standard for bribery, in violation of section 2(4) of the PACA ... is established by *Goodman* and *Tipco....*"). Nevertheless, the Judicial Officer never once, in his entire 96–page opinion, cited the actual definition of commercial bribery that was quoted in *Goodman* and employed by the agency in both *Goodman* and *Tipco.* Instead, the Judicial Officer cited the following dicta from the Judicial Officer's opinion in *Tipco*:

> Included within [the obligations of a PACA licensee] is the positive duty to refrain from corrupting an employee of a person with whom [the licensee] is dealing, *e.g.,* each PACA licensee is obligated to avoid offering a payment to a customer's employee to encourage the employee to purchase produce from it on behalf of his employer. On the other hand, if the employee seeks a payment from the licensee, the licensee is affirmatively obligated to report that request to its customer, could only make payments with the customer's permission, and, even then, would risk violating PACA with anything more than a *de minimis* payment (*e.g.,* more than a pen, calendar or lighter).

Judicial Officer Decision at 28, *reprinted in* J.A. 90 (quoting *Tipco,* 50 Agric. Dec. at 882–83, 1991 WL 295153, at **9). On the basis of that dicta—which, at most, establishes a *risk* of a PACA violation—the Judicial Officer reached the following con-

clusion with respect to the record in the instant case:

> As in *Goodman* and *Tipco,* JSG was obligated to refrain from making payments to Mr. Gentile and Mr. Lomoriello since such payments would encourage Mr. Gentile and Mr. Lomoriello to purchase tomatoes from JSG. JSG could only make such payments with its customers' permission. Even if it received permission, JSG should not have made more than *de minimis* payments to Mr. Gentile and Mr. Lomoriello. The payments [made by JSG to Messrs. Gentile and Lomoriello] were more than *de minimis.* Therefore, these payments constitute commercial bribery, in violation of section 2(4) of the PACA.

*Id.* at 28–29, *reprinted in* J.A. 90–91 (brackets in original). This conclusion blatantly ignores the legal test of commercial bribery established and applied in *Goodman* and *Tipco,* applying instead a *per se* rule that was never even contemplated in the prior cases.

Under the Judicial Officer's *per se* test, produce dealers are guilty of commercial bribery when they transfer items of value to purchasing agents, even if the agents' employers are fully aware of the gifts, and even if the dealers have no intent to induce the agents to buy from them. For example, Mr. Goodman claimed that he gave the Rolex watch to Mr. Gentile essentially as a gesture of friendship, and to celebrate Mr. Gentile's recovery from cancer. The Judicial Officer held that "[a]lthough Mr. Goodman said he was motivated by his friendship with Mr. Gentile, the [act of] bestowing such an expensive present upon Mr. Gentile at the time that JSG was selling large quantities of tomatoes to L&P . . . was unlawful." *Id.* at 35, *reprinted in* J.A. 97 (brackets in original); *see also* Reconsideration Order at 17, *reprinted in* J.A. 174 ("Mr. Goodman's alleged personal relationship with Mr. Gentile does not obviate the requirement that JSG refrain from making gifts of substantial value to Mr. Gentile[,] who was working for one of

JSG's customers."). Under this theory, as agency counsel conceded at oral argument, *see* Tr. of Oral Argument at 27–31, it would have been illegal for Mr. Goodman to give the *owner* of L&P a Rolex watch, or even for Mr. Goodman to take the owner of L&P out to lunch. These are farfetched notions of commercial bribery, at least under established law. We have been unable to find any precedent, in any context, that defines commercial bribery as here suggested, and agency counsel cited none.

Putting aside for the moment the question whether the Judicial Officer adequately justified his creation of this rather novel theory of commercial bribery, it is quite clear that this *per se* test deviates dramatically from the standard test for commercial bribery that was actually employed in *Goodman* and *Tipco.* For example, under the test cited in *Goodman,* the gift of the watch would not have been illegal unless there had been specific findings that Mr. Gentile's employer was not aware of the gift, and that Mr. Goodman intended to induce Mr. Gentile to purchase from JSG. Likewise, Mr. Goodman would hardly be guilty of commercial bribery under the traditional definition if he had taken the owner of L&P out to lunch, even if the purpose of the lunch was for Mr. Goodman to extoll the virtues of his product.

Although the agency was not strictly bound to follow the test for commercial bribery applied in prior cases, it was obligated to articulate a principled rationale for departing from that test. *See Gilbert v. NLRB,* 56 F.3d 1438, 1445 (D.C.Cir. 1995) ("It is, of course, elementary that an agency must conform to its prior decisions or explain the reason for its departure from such precedent."); *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 852 (D.C.Cir.1970) ("[A]n agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored, and if an agency glosses over or swerves from prior precedents without

discussion it may cross the line from the tolerably terse to the intolerably mute.") (footnote omitted). We find that the agency manifestly failed to explain its abrupt departure from prior precedent. We therefore are constrained to remand this case to the agency.

The agency may be able to provide a justification for applying a different and lesser standard for commercial bribery under § 2(4) than that cited in *Goodman*. Given the broad language of § 2(4), the agency is not necessarily bound by traditional statutory definitions of commercial bribery. Nonetheless, some justification for a lesser standard is necessary, for there is certainly no immediately apparent, or intuitive, rationale for a *per se* rule that does not require a finding of secrecy or intent to induce. Indeed, traditionally it is precisely the secrecy and intent to induce elements that are thought to transform otherwise innocent gifts into pernicious bribes that destroy marketplace competition. *See* 2 Rudolph Callman, THE LAW OF UNFAIR COMPETITION TRADEMARKS AND MONOPOLIES § 12.01, at 1 n.0.50 (4th ed.1996 & Supp.1999) ("When the fact that the seller is paying a commission to the buyer's purchasing agent is revealed to the buyer, there is no commercial bribery."); *id.* § 12.01, at 8–9 ("The consideration paid by the briber may involve such pecuniary benefits as cash payments, commissions and loans, or such nonpecuniary pleasures as dinner and entertainment (e.g., theatre tickets), and trips. In any case, the true test is the intent or purpose of the offeror: Is the consideration given to influence the agent and cause him to subordinate his bargaining function and judgment?") (footnote omitted); Franklin A. Gevurtz, *Commercial Bribery and the Sherman Act: The Case for Per Se Illegality*, 42 U. MIAMI L.REV. 365, 370–71 (1987) ("Businesses may (and usually do) provide gratuities, entertainment, campaign contributions, and the like in the hope of disposing the recipient favorably toward them. There must be more than this, however, to constitute a bribe. An agreement must

exist between the payor and the recipient that there will be a *quid pro quo*."). Even the PACA official who testified on behalf of the agency at the hearing conceded that a gift exchanged between old friends who happened to be in a seller-buyer relationship was unlikely to run afoul of PACA. *See* J.A. 249–50 (testimony of Bruce Summers, Senior Market Specialist in the Trade Practices Section of the USDA's PACA Branch).

Even assuming that Mr. Goodman's gifts to Mr. Gentile were made not out of pure friendship, but rather in an effort to curry favor with Mr. Gentile, it is not immediately obvious how the marketplace is disturbed—or how Mr. Goodman is violating any implied duty under PACA—if Mr. Gentile's employer is aware of the gifts, and there is no specific *quid pro quo* agreement between Mr. Goodman and Mr. Gentile. *Cf. United States v. Sun–Diamond Growers of California*, —— U.S. ——, ——, 119 S.Ct. 1402, 1406, 143 L.Ed.2d 576 (1999) (explaining that the "intent to influence" element of the federal bribery of public officials statute, 18 U.S.C. § 201(b)(1), (2), means that "for bribery there must be a *quid pro quo*—a specific intent to give or receive something of value in exchange for an official act"). In other words, without a finding of secrecy and intent to induce, there appears to be nothing to distinguish an illegal bribe from a simple promotional gift. *Cf. id.* at 1407 (criticizing as "peculiar" a reading of the federal gratuity statute, 18 U.S.C. § 201(c)(1)(A), (B), that would "criminalize, for example, token gifts to the President ... such as the replica jerseys given by championship sports teams each year during ceremonial White House visits [or] ... a high school principal's gift of a school baseball cap to the Secretary of Education ... on the occasion of the latter's visit to the school") (citation omitted). At oral argument, agency counsel acknowledged that it is, of course, not illegal for a seller to reduce his or her prices in an effort to induce purchases. But agency counsel ad-

mitted that, under the agency's *per se* standard, it *would* be illegal for the seller, rather than lowering prices, to instead take the owner of a purchasing entity out to dinner in an effort to promote his or her product. *See* Tr. of Oral Argument at 29, 31. There is no basis in the record or in the explanations offered by the agency for treating the latter transaction as illegal if the former is legal.

Indeed, Congress appeared to recognize the legality of promotional efforts when it passed the 1995 amendment to PACA, which allows the "good faith ... payment ... of collateral fees and expenses," which are defined as "any promotional allowances, rebates, service or materials fees paid or provided, directly or indirectly, in connection with the distribution or marketing of any perishable agricultural commodity." 7 U.S.C. §§ 499a(b)(13), 499b(4). Several of the gifts given to Mr. Gentile by Mr. Goodman arguably could be considered "promotional allowances" made in good faith (*i.e.,* not in secret), and in connection with the marketing of JSG's product. The Judicial Officer summarily dismissed this suggestion, asserting in a conclusory manner that the payments were not promotional devices. *See* Judicial Officer Decision at 76, *reprinted in* J.A. 138. But no reasoning is offered to support this conclusion. Agency counsel suggested at oral argument that the amendment was intended only to cover trivial promotional devices, such as sales banners provided by wholesale dealers to retail outlets. *See* Tr. of Oral Argument at 33. Counsel was unable, however, to cite to any legislative history to support that interpretation, and the agency has never proffered it in any previous adjudication. Such a limited interpretation of the 1995 amendment may be entitled to deference under *Chevron,* but the agency has yet to advance a coherent theory to support it.

On remand, the agency must explain its justification, if it has one, for employing a *per se* test for commercial bribery, and it must do so in conjunction with the 1995 amendment to PACA. The agency is free, of course, to abandon the *per se* approach, and apply the traditional commercial bribery test employed in *Goodman* and *Tipco.* In any event, the agency must make factual findings that are precisely connected to the standard employed. Although the Judicial Officer alluded to record evidence that might support findings of both secrecy and intent to induce—particularly with respect to the payments to Mr. Lomoriello, *see, e.g.,* Judicial Officer Decision at 54–61, *reprinted in* J.A. 116–23—even agency counsel concedes that the Judicial Officer did not follow a traditional commercial bribery test and made no explicit findings that were tied to such a test.

■ This court, of course, cannot sift through the record evidence to find support for the result reached by the agency, *see Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 50, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) ("It is well established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself."), nor can we affirm an agency's final order on the assumption that the agency might reach the same result upon remand, *see FEC v. Akins,* 524 U.S. 11, 118 S.Ct. 1777, 1786, 141 L.Ed.2d 10 (1998) ("If a reviewing court agrees that the agency misinterpreted the law, it will set aside the agency's action and remand the case—even though the agency (like a new jury after a mistrial) might later, in the exercise of its lawful discretion, reach the same result for a different reason."). Accordingly, we offer no view on the appropriate disposition of this case; the matters at issue here must be addressed by the agency in the first instance on remand of this case. Appropriate findings and conclusions by the agency may be made on the existing record or on a supplemented version of the existing record, as is deemed appropriate.

### III. Conclusion

For the reasons stated above, we grant the petition for review and remand this

case for further proceedings consistent with this opinion.

*So ordered.*