**RANKIN SALES CO., a Corporation, and Kenneth R. Rankin, Appellant,**

v.

**MORRIE H. MORGAN COMPANY and Farmers Frozen Food Company, California Corporation, Appellees.**

**No. 17145.**

United States Court of Appeals Ninth Circuit.

Nov. 13, 1961.

Garrett & Speier, by Dan L. Garrett, Jr., and Henry C. Krivetsky, San Francisco, Cal., for appellant.

Stark & Champlin; by Stanley E. Sparrowe and Ralph J. Moore, Jr., Oakland, Cal., for appellee.

Before HAMLIN and KOELSCH, Circuit Judges, and JAMESON, District Judge.

HAMLIN, Circuit Judge.

On December 12, 1956, Kenneth R. Rankin, assignor of Rankin Sales Company, appellant herein, and Morrie H. Morgan Company and Farmers Frozen Food Company, appellees herein, entered into a written contract covering the production and marketing of frozen strawberries. Appellees are described in said contract as being "in the business of producing, harvesting and packing for sale frozen strawberries" and appellant is described in said contract as being "engaged generally in the brokerage business and in making sales of frozen strawberries * * * as a broker."

The contract contains inter alia the following provisions:

"1. First Party [appellant] agrees that he will establish an office in the City and County of San Francisco and will devote his best efforts as a broker to the marketing of said products on a national basis, and will maintain such office as is appropriate to said program, and will hire necessary employees, and will provide all necessary facilities, excluding promotion expense and advertising, and will devote his best efforts to the sale of said products on a national basis.

"2. Second Parties [appellees] hereby agree, and hereby guarantee that they will market through First Party as a broker, a minimum of Fifteen Million (15,000,000) pounds of frozen strawberries per year beginning on March 1, 1957, or such amount of said frozen strawberries as will guarantee to First Party net brokerage commissions, exclusive of fees paid to associate brokers required for the sale of said strawberries, in the sum of Eighty Thousand Dollars ($80,000.00) per year, minimum. In the event the minimum commissions specified herein are not realized, then the rate of commissions hereinafter specified shall be altered to so provide."

The contract also provided at paragraph 5 for a brokerage fee of 4% of the total sales price of products handled by appellant where sales were made through associate brokers and of a brokerage fee of 3% where the products were directly sold by appellant.

For the first year of the contract appellees marketed 3,078,553 pounds of strawberries and paid appellant $26,-056.54. When appellees failed to pay an additional sum which would bring appellant's total commission to $80,000, appellant filed with the Secretary of Agriculture a claim against appellees for that amount, pursuant to the Perishable Agricultural Commodities Act, 7 U.S.C.A. § 499a et seq. Said Act provides for the licensing by the Secretary of Agriculture of commission merchants, dealers and brokers; sets out what are violations of the Act; and provides that the Secretary of Agriculture in addition to revoking licenses for violations of the Act may make reparation orders requiring persons licensed under the Act to make reparations for violations of the Act.

On June 15, 1959, the Secretary of Agriculture, after making findings of fact, issued a reparation order directing appellees to pay appellant $53,943.46 plus interest. Appellees appealed from this order to the United States District Court for the Northern District of California, Southern Division, where under the provisions of the Act persons appealing from the decision of the Secretary are entitled to a trial de novo.[1] During this trial the question was raised as to whether the Secretary had jurisdiction under the Perishable Agricultural Commodities Act to issue the reparation order. With the consent of the parties the trial was recessed without completing the examination of the first witness and the parties submitted briefs to the district court upon the jurisdictional issue. The district court thereafter vacated the Secretary's reparation order upon the ground that the Secretary lacked jurisdiction. Appellant timely appealed to this court, which has jurisdiction under 28 U.S.C.A. § 1291.

Certain of the findings of fact and conclusions of the Secretary are set out in the margin.[2]

---

1. 7 U.S.C.A. § 499g(c).

2. "Findings of Fact

\* \* \* \* \*

"4. On or about December 12, 1956, in contemplation of the shipment of perishable agricultural commodities in interstate commerce, respondents and Kenneth R. Rankin entered into a written contract whereby, subject to certain exceptions, Rankin became the exclusive broker for the sale of frozen strawberries packed by respondents.

"5. Under the Contract, Rankin agreed to establish and maintain a sales office in San Francisco, California, and to de-

Under the provisions of 7 U.S.C.A. § 499g, the Secretary of Agriculture has jurisdiction to make reparation orders for violations of section 499b. The relevant portion of this latter section reads as follows:

"It shall be unlawful in or in connection with any transaction in interstate or foreign commerce—

\*  \*  \*  \*  \*  \*

"(4) For any commission merchant, dealer, or broker to make, for a fraudulent purpose, any false or misleading statement in connection with any transaction involving any perishable agricultural commodity which is received in interstate or foreign commerce by such commission merchant, or bought or sold, or contracted to be bought, sold, or consigned, in such commerce by such dealer, or the purchase or sale of which in such commerce is negotiated by such broker; or to fail or refuse truly and correctly to account and make full payment promptly in respect of any transaction in any such commodity to the person with whom such transaction is had; or to fail, without reasonable cause, to perform any specification or duty, express or implied, arising out of any undertaking in connection with any such transaction."

It would appear from the language of the above section that the "transactions" which are sought to be regulated involving perishable agricultural commodities are those in which the commodities have been received in interstate commerce by a commission merchant or bought or sold or contracted to be bought, sold, or con-

---

vote his best efforts to the sale of respondents' product; and respondents agreed to market through Rankin each year a minimum of 15,000,000 pounds of frozen strawberries, or such amount thereof as would guarantee to him net brokerage commissions in the sum of $80,000. The contract provided that if commissions in this sum were not realized at the rates specified therein, these rates would be adjusted to accomplish this result.

"7–8. During the period from December 12, 1956, . . . to March 1, 1958, complainant performed all of its obligations under the contract.

"9. During the period from December 12, 1956, to March 1, 1958, respondents failed to perform all of their obligations under the contract in that they marketed through complainant only 3,078,553 pounds of frozen strawberries and paid complainant net brokerage in the sum of only $26,056.54.

"10. On or about March 2, 1958, complainant indicated to respondents that it desired to be excused from further performance under the contract.

\*  \*  \*  \*  \*

"Conclusions

\*  \*  \*  \*  \*

"It appears that the parties entered into this contract with rosy expectations that the arrangement would prove mutually profitable. And but for a downward swing in the strawberry market, it seems more than likely that these expectations would have been fully realized.

The evidence shows that on the strength of his contract with respondents, Kenneth R. Rankin resigned a salaried position and opened a sales office in San Francisco which he staffed with competent assistants, and that he devoted his best personal efforts to the sale of respondents' products at the most favorable prices he could obtain. Nevertheless, due to circumstances beyond his control, he was unable to find a market for anything like the 15,000,000 pounds of strawberries referred to in the contract as a minimum figure. Perhaps he could have done so if respondents had been willing to sell their products at lower prices. They cannot, of course, be blamed for not wishing to sell at a loss. On the other hand, the evidence indicates that at times they preferred not to offer their products at prices which were competitive, and that they pursued this policy not only because they wished to avoid an unprofitable operation, but also because they felt it would enable them, in the long run, to strengthen their position in the industry.

\*  \*  \*  \*  \*

"The failure of respondents to pay the balance due complainant under the contract (the guarantee of $80,000 less the net brokerage paid of $26,056.54) is in violation of section 2 of the act. Reparation in the amount of $53,943.46, with interest, should be awarded complainant against both respondents, jointly and severally. Of course, payment of a total of $53,943.46, with interest, to complainant will discharge its claim."

**116**

signed in such commerce by a dealer, or the purchase or sale of which in such commerce is negotiated by a broker. It does not appear that the transaction involved in this case is one that is covered by the above section.

An examination of the legislative history of this act [3] prior to its adoption dis-

closes that the legislators had a far different conception of the transactions covered than that of the appellant herein. Various statements made in both the House of Representatives and the Senate at the time the legislation was being debated are set out in the margin.[4] The gist of all of these statements is that the

3. 46 Stat. 531 (1930). Before passage the Act was identified as the Borah-Summers Bill, S. 108, 71st Cong. (1929-30).

4. Excerpts from debate in House of Representatives appearing in the Congressional Record, Vol. 72, Part 8:

Mr. Summers: " * * * it does eliminate the necessity of going into court before a jury at a long distance and at great expense in order to secure an adjustment of a one hundred dollar or two or three hundred dollars difference. * * the Department of Agricultural says the average claim in these unwarranted cases is about $196.50—not enough to go into court for." [at p. 8538]

In advocating the bill in his special message to Congress, the President of the United States recommended legislation

"to provide for licensing of handlers of some perishable products so as to eliminate unfair practices. Every penny of waste between farmer and consumer that we can eliminate, whether it arises from methods of distribution or from hazard or speculation, will be a gain to both farmer and consumer." [at p. 8538]

Alexander Legge, chairman of the Federal Farm Board, said:

"The bill provides primarily for the regulation of and suppression of unfair practices among dealers handling such products in the terminal markets. The elimination of unfair practices should enable cooperative associations handling perishable products to obtain greater returns for their members, and the proposed legislation therefore should supplement the work of the Federal Farm Board." [at p. 8538]

Mr. Brigham: "Let us assume a commission man has made a contract with a producer of apples in a gentleman's state for a car of apples of a certain grade at a certain price. Now during the transit of those apples across the continent, several days must elapse, and during that time the market might go down. Is it not the practice of unscrupulous dealers to turn down such a shipment under those circumstances on the ground that it does not come up to the specified grade and

the shipper is compelled to accept some reduction in order to save a greater loss?" [at p. 8538]

Mr. Fulmer: "It is the purpose of this Bill to suppress unfair and fraudulent practices in marketing perishable agricultural commodities." [at p. 8540]

Mr. Summers: "This Bill sets up a licensing system whereby you may get relief in a shortage of $100 or $200, where you cannot afford to go into court. An unscrupulous dealer or commission merchant at a distance will not take chances on forfeiting his license in order to inflict a fraud of $100 or $200 against his customer." [at pp. 8541-2]

" * * * This bill undertakes to adjust the small infractions where they cannot afford to go into court, and they constitute 90% of the offenses." [at p. 8542]

Mr. Garber of Virginia: "What does the Bill propose to do? It is simply a case of protecting the producer back home in the shipment of products— * * perishable products—against reprehensible practices of irresponsible commission men * * *.

" * * * the shipment goes into a foreign state. There may be $100 involved or $200 and that means that the producer back home cannot afford to go 100 miles or 200 miles or 500 miles to fight for a small claim of two or three hundred dollars." [at p. 8543]

Mr. Abernathy: "A further thing that appeals to me is that if one of these commission men undertakes to take away the produce of the shipper, then the shipper has some forum to which he may appeal and have the commission man's license taken away from him. I think that is the strongest thing in the bill." [at p. 8544]

Mr. Snow of Maine: "In a general way the Summers Bill, if passed, will bring relief to at least a million vegetable and fruit farmers in this country, and at the same time make it possible for the poorer people in the large cities to be beneficiaries when the crops are abundant. * * * unfair commission merchants and dealers in large centers, when there is a glut in the market or when prices have suddenly dropped, wrongfully reject

purpose was to protect a shipper of perishable products against dishonest or unscrupulous conduct of persons who handled these perishable products after they had been shipped in interstate commerce. The illustrations given in the legislative debates are far different from the transaction in question. Here there is no question of dishonest or unscrupulous conduct; here there is no question of perishable products being refused at a point which is at a distance from the shipping point; here there is no contention that there was any perishable product in transit which was not up to specifications or standards. On the contrary, appellant's claim herein is made after the termination of the one year contract period for a minimum commission of $80,000.

Appellant contends that it has a fixed contract for an $80,000 commission which does not depend on the amount of frozen strawberries which were marketed through the appellants for the year in question. It claims to be entitled to $80,000 regardless of whether appellees shipped 3,000,000 pounds, 15,000,000 pounds, or 1,000 pounds of frozen strawberries throughout the year.[5] On the other hand, appellees contend that the contract is ambiguous, and they give an entirely different meaning to the transaction. This controversy is clearly not one which the Perishable Agricultural Commodities Act was intended or designed to correct.

It has been recognized that all activities of persons handling perishable products do not come within the jurisdiction

---

carload shipments and let them decay on the sidings until the health authorities are forced to issue dumping orders. In this way the customers are wrongfully deprived of the benefits of abundant crops at reasonable prices and the producing farmers are made the goats. The Summers Bill will put an end to this pernicious practice." [at p. 8547]

Similar statements from Mr. Burtness of North Dakota. [at p. 8548]

Mr. Larsen of Georgia: "Under the provisions of the law as now written, if a man violates the law he may or may not be punished, although he has cheated some poor fellow out of $200 or $300. So small an amount is considered a trivial matter and he may never be prosecuted. The victim may say for instance, 'I cannot afford to go to Chicago, hundreds of miles away to prosecute one for small violation of law. I have already lost enough, and I do not want to get mixed up in the courts." [at p. 8548]

Excerpts from debate in the United States Senate appearing in the Congressional Record, Vol. 71, Part 2:

Mr. Borah: "The design of this bill is in case a party makes a false charge as to the condition of the stuff or rejects it · without reason upon false grounds, then, upon a hearing before the Secretary of Agriculture, the party may be suspended for ten days or for ninety days or, in an aggravated case, his license may be taken away from him. How else can we possibly protect the shipper of perishable products? If there is honest dealing the Secretary is not called upon to act." [at p. 2164]

Mr. Borah: "That gives a single illustration of the real evil which we are trying to remedy. Where a farmer ships through a commission merchant he takes and must take almost entirely the statement of the commission merchant as to the condition of the goods when they arrive, whether they are acceptable or fit for market." [at p. 2165]

Mr. Blease: " * * * [B]ut suppose there are three brokers here or half a dozen, and they should agree among themselves that they would not handle produce, or have it shipped to them, except that the shipper from South Carolina or Idaho, for instance, should ship to himself. For instance, the Senator would ship to William E. Borah, at Washington, D.C., and the goods would be here for him and the broker would be simply his agent, instead of acting as a broker."

Mr. Borah: "If I should make that kind of a contract, I would have to live up to it."

Mr. Blease: "Suppose they should refuse to handle goods otherwise? Is there anything in this bill by which shippers could get any redress?"

Mr. Borah: "No; under those circumstances I do not think the bill would cover the facts * * *." [at p. 2229]

5. Appellant's contention is based on its interpretation of paragraph 2 of the contract, set out above, that if appellee did not market enough strawberries during the year in question to realize a commission of $80,000 at the contract rate, the rate would be altered as to the amount actually marketed so as to provide the said $80,000 commission.

of the Secretary under the act in question. In Reid & Joyce Packing Co. v. Touchstone, 15 Agriculture Decisions 884 (1956), the facts showed that the complainant Reid & Joyce contracted to sell 280 crates of lettuce to a pool of buyers in Texas. The complainant loaded the lettuce upon respondent's truck in Salinas, California. Respondents transported the lettuce to Texas from Salinas, where on arrival the buyers refused to accept the lettuce because of its condition. Respondent advised the broker that he was responsible for the condition of the lettuce. He made part payment to the broker but did not pay the balance due. A complaint for the balance was filed with the Secretary under the Perishable Agricultural Commodities Act. The Secretary dismissed the action, making the following statement:

> "There is then for consideration the question whether a contract for the transportation of perishable agricultural commodities is within the coverage of the Perishable Agricultural Commodities Act. This is a question of jurisdiction, which we raise." [6]

The Secretary then cited the provisions of 7 U.S.C.A. § 499b(4) and referred to the word "transaction" therein as follows:

> "Although the word 'transaction' is not defined in the act or regulations, it has been consistently construed to mean any of the types of contracts or understandings which are mentioned in the definitions in the act for commission merchants, dealers, and brokers, that is, consignments, purchases and sales, and the negotiating of sales and purchases on behalf of a seller or purchaser. In *Anonymous Decision*, 4 A.D. 332 (1945), it was held that the evidence failed to establish a sale of the tomatoes by complainant to respondent as alleged in the complaint and

that the act conferred no jurisdiction to award reparation for money loaned by complainant to respondent to purchase tomatoes from others or for complainant's charges for hauling the tomatoes to respondent. In *Anonymous Decision*, 4 A.D. 934 (1945), it was found that complainants and respondent entered into a contract whereby respondent was to ship carloads of grapes to complainants and the latter were to receive a commission for arranging for storage space, payment of the freight charges and gassing the grapes. Respondent failed to ship any grapes to complainants. It was held that the stipulated compensation was not for grapes bought or sold or contracted to be bought or sold or consigned, or the purchase and sale thereby negotiated by a broker, and, therefore, respondent's failure to pay complainants for the kind of services that were to be rendered was not in violation of the act.

> "It is concluded that the act does not confer jurisdiction to award reparation for negligence under a transportation contract and, for this reason, the complaint herein should be dismissed." [7]

We agree with the reasoning in the above decision and in the decisions cited therein.

The transaction here involved was not one covered by the act in question, and was not one within the scope of the jurisdiction of the Secretary to issue reparation orders.

What the meaning of the contract is and whether the appellant is entitled to damages thereunder should be determined in a civil action in a court of competent jurisdiction as suggested by the district court.

The judgment of the district court is affirmed.

6. 15 Agriculture Decisions at 887.

7. Ibid.