**JSG TRADING CORP., Petitioner,**

v.

**DEPARTMENT OF AGRICULTURE**
and United States of America,
Respondents.

No. 00–1011.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 1, 2000.

Decided Jan. 5, 2001.

Robert M. Adler argued the cause for petitioner. With him on the briefs were Gary C. Adler and John M. Himmelberg.

M. Bradley Flynn, Attorney, U.S. Department of Agriculture, argued the cause for respondents. With him on the brief were James Michael Kelly, Associate Gen-

eral Counsel, and Margaret M. Breinholt, Acting Assistant General Counsel.

Before: SENTELLE, RANDOLPH, and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

This case returns to us after remand on JSG Trading Corp.'s petition for review of a Department of Agriculture order adjudging it guilty of commercial bribery and revoking its license to sell produce under the Perishable Agricultural Commodities Act. We outlined many of the financial dealings at issue here in *JSG Trading Corp. v. United States Dep't of Agric.*, 176 F.3d 536 (D.C.Cir.1999), and will assume familiarity with that opinion. This time around JSG challenges the sufficiency of the evidence and raises three questions: (1) did the Department apply the wrong legal standard for commercial bribery? (2) were the payees principals in the victim companies, thereby precluding a finding of commercial bribery? and (3) is license revocation excessive? We answer no to each and deny the petition.

## I.

■ Section 2(4) of the Perishable Agricultural Commodities Act of 1930 (PACA) forbids "any commission merchant, dealer or broker * * * to fail, without reasonable cause, to perform any specification or duty, express or implied, arising out of any undertaking in connection with any such [produce] transaction." 7 U.S.C. § 499b(4).[1] The Department has drawn

---

1. Title 7, U.S.C. § 499b(4) states in full:

   It shall be unlawful in or in connection with any transaction in interstate or foreign commerce [f]or any commission merchant, dealer, or broker to make, for a fraudulent purpose, any false or misleading statement in connection with any transaction involving any perishable agricultural commodity which is received in interstate or foreign commerce by such commission merchant,

   or bought or sold, or contracted to be bought, sold, or consigned, in such commerce by such dealer, or the purchase or sale of which in such commerce is negotiated by such broker; or to fail or refuse truly and correctly to account and make full payment promptly in respect of any transaction in any such commodity to the person with whom such transaction is had; or to fail, without reasonable cause, to perform any

from this language a duty of produce sellers not to corrupt agents and employees of their buyers, and has styled the breach of this duty "commercial bribery." In brief, this duty is breached—and commercial bribery results—when a seller offers consideration to a buyer's agent or employee, without the knowledge of the principal or employer, with intent to induce purchase of the seller's product. *See In re Sid Goodman & Co.*, 49 Agric. Dec. 1169 (1990), *aff'd*, 945 F.2d 398 (4th Cir.1991) (table), and *In re Tipco, Inc.*, 50 Agric. Dec. 871 (1991), *aff'd*, 953 F.2d 639 (4th Cir.1992) (table).

JSG Trading Corp. is a New Jersey-based PACA licensee engaged in buying and selling produce. L&P and American Banana are produce dealers at the Hunts Point Market in New York City. L&P and American Banana purchased tomatoes from JSG through purchasing agents—Anthony Gentile for L&P; Albert Lomoriello for American Banana. In early 1993, the Department began investigating whether JSG sought to covertly influence Anthony Gentile and Albert Lomoriello to purchase more tomatoes from JSG on behalf of their respective principals in violation of PACA § 2(4), as interpreted in *Goodman* and *Tipco*. The Department identified what it considered questionable transactions and accounting practices, several of which an Administrative Law Judge found were commercial bribes. The ALJ ordered JSG's license revoked. *See In re JSG Trading Corp.*, 56 Agric. Dec. 1800 (1997). The Department's Judicial Officer affirmed the ALJ's findings and order. *See In re JSG Trading Corp.*, 57 Agric. Dec. 640 (1998).

specification or duty, express or implied, arising out of any undertaking in connection with any such transaction; or to fail to maintain the trust as required under subsection 499e(c) of this title. However, this paragraph shall not be considered to make the good faith offer, solicitation, payment, or receipt of collateral fees and expenses, in and of itself, unlawful under this chapter.

## II.

### A. Substantial Evidence

An agency's adjudicative orders must be supported by "substantial evidence," 5 U.S.C. § 706(2)(E), which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" when taking "into account whatever in the record fairly detracts from its weight." *See AT&T Corp. v. FCC*, 86 F.3d 242, 247 (D.C.Cir.1996) (quoting *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300, 59 S.Ct. 501, 83 L.Ed. 660 (1939), and *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951)); *McCarty Farms, Inc. v. Surface Transp. Bd.*, 158 F.3d 1294, 1300-01 (D.C.Cir.1998). There is substantial evidence to support the Judicial Officer's finding that JSG's payments, described below, to Anthony Gentile, to his wife Gloria Gentile, and to Albert Lomoriello were commercial bribes under *Goodman* and *Tipco*.

The payments at issue here consisted of: 35 checks to Anthony Gentile totaling $62,535.60; payments to Gloria Gentile, including an unjustified gain on a stock sale; a check for $5,600 to G&T Enterprises, a company Gloria Gentile set up for tax purposes; and seven checks to Albert Lomoriello totaling $9,733.45.[2]

JSG tendered numerous "innocent" explanations for these transactions and the bizarre accounting practices surrounding them, none of which is persuasive. For instance, JSG insists that the checks made out to Anthony Gentile were "circular" because they were redeposited in JSG's ac-

2. On remand, the Judicial Officer found that JSG's lease of a Mercedes to Anthony Gentile, paid for in part by JSG; its sale of a boat to Mr. Gentile for a fraction of its value; and its gift of a $3,317 Rolex watch to Mr. Gentile were not commercial bribes because they were not intended to induce him to purchase tomatoes and L&P was aware of the transactions. *See In re JSG Trading Corp.*, 58 Agric. Dec. 1041, 1061 (1999).

counts with no money ever reaching the payee. According to JSG, "none of the monies reflected by these checks ever reached Mr. Gentile or [was] otherwise paid by JSG to any person (or any entity) for his benefit." Final Brief of Petitioner at 18. The checks, JSG claims, functioned as "clips," a mechanism to reconcile accounts: "these 'clips' were used ... in order to permit L&P to pay less than JSG's invoiced prices in order to make up for a loss on prior purchases." *Id.* at 20 n. 19. But writing checks payable to another company's purchasing agent and then re-depositing them into one's own account is hardly a recognized or plausible way to reconcile accounts between a seller and the payee's principal, the buyer. The normal function of checks is to move money from one account to another, not to keep it in place. Making checks payable to L&P's purchasing agent and then re-depositing them does not appear, as JSG claims, to "permit L&P to pay less than JSG's invoiced prices." The Judicial Officer had ample evidence for finding JSG's explanations chimerical, particularly in light of the inability of JSG's officers to give a coherent explanation of this unusual accounting procedure; JSG's treatment of the payments in its records as profit-sharing with Mr. Gentile and as reductions in Mr. Gentile's debt to JSG; and the apparent relationship between the amount of each check and a per-box commission noted in JSG's records.[3] *See* 58 Agric. Dec. at 1064–77.

The Judicial Officer was also on solid ground in rejecting JSG's explanations for its payments to Mrs. Gentile and Mr. Lomoriello. No evidence indicates the payments were compensation for any legitimate service rendered. Much evidence tends to show that the payments were secret per-box commissions intended to induce the purchase of more tomatoes from JSG. *See* 58 Agric. Dec. at 1061–64 & 1081–88. We have doubts, however, about the $5,600 check to Mrs. Gentile's compa-

ny, G&T. In its opposition to JSG's motion to dismiss the case on remand, the Department appeared to concede that the payment to G&T was not a commercial bribe, a statement inconsistent with its position in this court. *See* Complainant's Response to JSG's Motion to Dismiss and for Entry of Judgment at 5 & n.2; Joint Appendix at 389. At any rate, we cannot see how the $5,600 payment could affect the outcome of this case. The remaining payments to Mr. and Mrs. Gentile and Mr. Lomoriello amply support revocation of JSG's PACA license.

### B. Legal Standard for Commercial Bribery

JSG claims the Judicial Officer misapplied the commercial bribery standard articulated in *Goodman* and *Tipco*. In our first opinion in this case, we held that the Judicial Officer erred in substituting a per se test for *Goodman's* and *Tipco's* intent-to-induce and secrecy standard. *See* 176 F.3d at 543–46. Under the per se test, any payment to a purchasing agent above a *de minimis* threshold constituted a commercial bribe, regardless of intent and secrecy. We remanded for the Judicial Officer either to justify or to abandon the per se test. He adopted the latter course.

On remand, the Judicial Officer interpreted PACA's duty requirement as imposing on "each commission merchant, dealer, and broker ... an obligation ... to avoid making or offering a payment to a purchasing agent to encourage that agent to purchase produce from the commission merchant, dealer, or broker on behalf of the agent's principal or employer, without fully informing the purchasing agent's principal or employer of the offer or payment." 58 Agric. Dec. at 1051. He disaggregated this obligation into a four-part test:

Proof that: (1) a commission merchant, dealer, or broker made a payment to or offered to pay a purchasing agent; (2)

---

**3.** JSG stated at oral argument that it was not challenging the Judicial Officer's finding that

16 of the 35 checks were used to reduce Mr. Gentile's debt to JSG.

the value of the payment or offer was more than *de minimis*; (3) the payment or offer was intended to induce the purchasing agent to purchase produce from the commission merchant, dealer, or broker making the payment or offer; and (4) the purchasing agent's principal or employer was not fully aware of the payment or offer made by the commission merchant, dealer, or broker to the purchasing agent, raises the rebuttable presumption that the commission merchant, dealer, or broker making the payment or offer violated section 2(4) of the PACA.

58 Agric. Dec. at 1051. The presumption is rebutted by the absence of any one element. *See id.*

JSG perceives in this phrasing of the test three substantial and unexplained departures from *Goodman, Tipco,* and our opinion in *JSG Trading Corp.*: (1) failure to require a specific *corrupt* intent to induce; (2) equation of secrecy with the payee's principal's or employer's lack of full awareness of the payment or offer; and (3) omission of a *quid pro quo* requirement. This new test, JSG insists, is the per se test redux, and will "turn countless normal business transactions in to [*sic*] bribes." Final Brief of Petitioner at 33–34.

■ The Judicial Officer's test is consistent with *Goodman* and *Tipco.* Although couched as a presumption,[4] the post-remand articulation of the test is a more formalized version of the *Goodman/Tipco* intent-to-induce and secrecy standard. When the presumption language is cast aside, the test's basic structure parallels that of many criminal statutes. There are four elements, each of which is a necessary predicate for liability. Failure to satisfy any one element defeats liability. The

only significant divergence from *Goodman* and *Tipco* is the addition of a *de minimis* threshold as an apparent defense to payments or offers to pay that otherwise satisfy the intent and secrecy elements. This *de minimis* element is the converse of that which we rejected in *JSG Trading Corp.,* wherein a payment above the *de minimis* threshold was a sufficient rather than a necessary condition for liability. The addition of this liability-defeating element is innocuous and, in any event, JSG does not challenge it.

Neither *Goodman, Tipco,* nor our opinion in *JSG Trading Corp.* requires a specific corrupt intent, a lower secrecy standard, or a *quid pro quo* for commercial bribery. In both *Goodman* and *Tipco,* a generalized intent by the payer to induce purchase of its product satisfied the intent element. In *Goodman,* for example, the Judicial Officer referred to a treatise definition of commercial bribery that contains no hint of specific corrupt intent: "the 'offer of consideration to another's employee or agent in the expectation that the latter will, without fully informing his principal of the 'gift,' be sufficiently influenced by the offer to favor the offeror over other competitors'." *Goodman,* 49 Agric. Dec. at 1184 (quoting 2 Rudolf Callmann, The Law of Unfair Competition, Trademarks and Monopolies § 49 (3d ed.1968)). An "expectation" is far from the specific corrupt intent JSG would require. In another place, the Judicial Officer wrote that a "PACA licensee is obligated to refrain from offering a payment to a customer's employee to encourage the employee to purchase produce from it on behalf of the employer." *Goodman,* 49 Agric. Dec. at 1186. *See also Tipco,* 50 Agric. Dec. at 883. In *Tipco,* the Judicial Officer con-

---

4. The presumption language appears not to perform any burden–allocating function ordinarily associated with presumptions. `See, e.g.,* Fed.R.Evid. 301 ("In all civil actions and proceedings not otherwise provided for by Act of Congress or by these rules, a presumption imposes on the party against whom it is di-

rected the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast.").

cluded that "the evidence of record is certain that licensee Tipco made surreptitious payments to its customer's employee to induce the employee to buy, or continue to buy, its produce...." *Tipco*, 50 Agric. Dec. at 889. *Goodman* and *Tipco* say nothing of specific corrupt intent, let alone enough to make the Judicial Officer's formulation of the intent element in this case arbitrary and capricious.[5]

The secrecy element in *Goodman* and *Tipco* contemplates a sufficiently high level of awareness by the payee's employer or principal to justify the Judicial Officer's insistence on "full awareness." The opinions contain language equating a produce seller's breach of duty to a seller's failure to inform, which connotes an obligation to impart actual knowledge of the payments to the payee's employer or principal. *See Goodman*, 49 Agric. Dec. at 1175, 1179, 1182, & 1186; *Tipco*, 50 Agric. Dec. at 883. The opinions also contain language equating secrecy with the payer's expectation that the recipient not fully disclose the payment, which connotes an obligation that somebody—either the payer or payee—ensure the recipient's principal or employer has full awareness of the transaction. *See, e.g., Goodman*, 49 Agric. Dec. at 1184. Yet other language suggests that knowledge alone is not enough, that without an affirmative grant of consent by the payee's principal or employer the secrecy element would be satisfied. *See Goodman*, 49 Agric. Dec. at 1186 ("payments by [Goodman] to Messrs. Crandall and Hernandes, without

permission of Magruder and Fresh Value, is a violation of section 2(4) of the PACA"); *Tipco*, 50 Agric. Dec. at 883 (suggesting that a produce seller may "only make payments with the customer's permission"). Both cases give produce vendors ample notice that payments intended to induce the buyer's agents or employees to purchase produce are commercial bribes unless the payee's principal or employer is fully aware of the transaction.[6]

Similarly, *Goodman* and *Tipco* do not require a *quid pro quo* arrangement between the payer and the payee. Although a *quid pro quo* arrangement was present in each case—a 25x per box kickback—neither case turned on that fact.[7] Perhaps recognizing this, JSG instead points to our earlier opinion in *JSG Trading Corp.* for a *quid pro quo* requirement. In that opinion, we criticized the per se test's lack of an intent and secrecy element as eliding the line between bribes and legitimate transactions and elliptically suggested a *quid pro quo* element as one way to restore that line. *See JSG Trading Corp.*, 176 F.3d at 545. We did not suggest it was the exclusive means. Indeed, the Judicial Officer fully restored that line by resurrecting the intent and secrecy elements. The federal cases requiring a *quid pro quo* that JSG cites do not persuade us otherwise, for they interpret federal criminal bribery statutes containing entirely different language than PACA.[8] *See, e.g.,*

---

**5.** The occasional references to corrupting agents or employees in *Goodman* and *Tipco* describe the effect of commercial bribery, not the required intent.

**6.** In both *Goodman* and *Tipco*, the victim companies had an explicit policy forbidding employees to accept gifts from vendors, which the recipients of the payments in each case clearly breached. *See Goodman*, 49 Agric. Dec. at 1174–75; *Tipco*, 50 Agric. Dec. at 878. Neither case turned on the existence of such a policy.

**7.** Notably, the Judicial Officer found, and we agree, that JSG's per-box payment scheme constituted a *quid pro quo*. *See* 58 Agric.

Dec. at 1090. As in *Goodman* and *Tipco*, our decision does not turn on this fact.

**8.** Given the substantial ambiguity in § 499b(4), it is the Department's function, not ours, to define offenses under that provision. *See Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *JSG Trading Corp.*, 176 F.3d at 545 ("Given the broad language of [PACA] § 2(4), the agency is not necessarily bound by traditional statutory definitions of commercial bribery."). Our review is limited to ensuring that the Department's construction of PACA is reasonable and that the Department either follows its prior constructions

*United States v. Sun–Diamond Growers of California,* 526 U.S. 398, 404–05, 119 S.Ct. 1402, 143 L.Ed.2d 576 (1999) (interpreting language in 18 U.S.C. § 201 as requiring a *quid pro quo* for bribery because there must be "a specific intent to give or receive something of value *in exchange* for an official act"); *see also* 2 RUDOLF CALLMANN, THE LAW OF UNFAIR COMPETITION, TRADEMARKS AND MONOPOLIES § 12.02 (1985) ("There need be no close relationship between the value of the consideration and the resulting advantage to the offeror."). JSG's related contention that its payments had no effect on the victim companies' purchases or prices merely restates the *quid pro quo* argument. To the extent the argument differs, nothing in PACA, *Goodman,* or *Tipco* bases illegality on changes in the victim company's purchasing or pricing behavior.

■ JSG fears that the commercial bribery test will sweep up legitimate business transactions and ordinary social hospitality. JSG forgets that the intent and secrecy elements are necessary, not sufficient, conditions for commercial bribery, so both must be satisfied. Social hospitality—for example, taking a friend who happens to be a purchasing agent to dinner—would be protected if the host lacked the intent to induce purchase of its products (or, if it had such intent, informed the agent's principal). Similarly, sales incentives offered to a purchasing agent are perfectly legal under the Judicial Officer's test if the agent's principal is informed of the transaction.

The secrecy element in particular also distinguishes the transactions at issue from a category of promotional activities recognized as legitimate by PACA. The paragraph of PACA from which the Department drew the prohibition on commercial bribery states that "this paragraph shall not be considered to make the good faith offer, solicitation, payment, or receipt

of collateral fees and expenses, in and of itself, unlawful under this chapter." 7 U.S.C. § 499b(4). The statute defines "collateral fees and expenses" as "any promotional allowances, rebates, service or materials fees paid or provided, directly or indirectly, in connection with the distribution or marketing of any perishable agricultural commodity." 7 U.S.C. § 499a(b)(13). JSG's payments to Anthony and Gloria Gentile and Albert Lomoriello do not fall within this category. Promotional allowances, rebates, and the like are typically given with the buyer's knowledge rather than secretly directed to the buyer's agents or employees. JSG's payments also lack the requisite good faith, which Department regulations define as "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." 7 C.F.R. § 46.2(hh). No reasonable conception of honesty or fair dealing includes secret payments designed to corrupt a produce buyer's agents or employees.

### C. Status of the Payees

■ The essence of the commercial bribery offense, as defined by *Goodman* and *Tipco,* is the corruption or attempted corruption by the produce seller of its buyer's agent or employee. So framed, it does not cover payments made to an employer or a principal. Nor could it, as payments made to the produce buyer itself, as opposed to its agents or employees, do not possess the requisite secrecy. If Mr. Gentile and Mr. Lomoriello were principals in L&P and American Banana, then JSG did not commit commercial bribery.

■ We agree with the Judicial Officer that they were not principals. They were purchasing agents. *See* 58 Agric. Dec. at 1051 (characterizing Mr. Gentile and Mr. Lomoriello as purchasing agents). Mr. Gentile's and Mr. Lomoriello's joint account arrangements[9] with L&P and Amer-

---

of the statute or articulates a reasoned justification for departing.

9. The Department's regulations define a joint account transaction as "a produce transac-

ican Banana do not alter the basic fact that these companies hired them to buy and sell tomatoes on the companies' behalf. Although each man shared profits and losses on his tomato transactions, there is no evidence that either became a full partner in his respective firm. Mr. Gentile, for instance, shared 15 percent of the profits and losses on his tomato sales for L&P. Nothing indicates he shared in profits and losses on any firm activity other than that which he was specifically engaged to perform, whereas full partners in a business typically share profits and losses in all the firm's activities. *See, e.g.,* UNIF. P'SHIP ACT § 202(a) (1997) (defining partnership as "the association of two or more persons to carry on as co-owners a business for profit"). Likewise, Mr. Lomoriello shared 40 percent of the profits and losses on his produce transactions for American Banana, but nothing indicates he shared in American Banana's overall profits and losses or otherwise became a co-owner. Far from indicating co-ownership, the limited profit- and loss-sharing arrangements were a performance-based compensation mechanism fully consistent with Mr. Gentile's and Mr. Lomoriello's status as agents or employees. *See* 58 Agric. Dec. at 1093–94; *see also* UNIF. P'SHIP ACT § 202(c)(2) & (3) (1997) (stating that "the sharing of gross returns does not by itself establish a partnership," and that "a person who receives a share of the profits of a business is presumed to be a partner in the business, unless the profits were received in payment … for services as an indepen-

dent contractor or of wages or other compensation to an employee.").

■■■ JSG nonetheless contends that Mr. Gentile and Mr. Lomoriello were independent brokers and argues, without citation, that "payments to independent brokers are permissible under the PACA." *See* Final Brief of Petitioner at 46–48. JSG apparently believes that independent brokers are principals because they are subject to PACA. The statute itself belies this claim. Brokers by definition negotiate "for or on behalf of the vendor or the purchaser."[10]  7 U.S.C. § 499a(b)(7). Agents, not principals, act on another's behalf. *See* RESTATEMENT (THIRD) OF AGENCY § 1.01 (Tentative Draft No. 1, 2000) ("Agency is the fiduciary relationship that arises when one person (the 'principal') manifests consent to another person (the 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent consents so to act."). Nor does the requirement in 7 U.S.C. § 499c(a) that brokers obtain licenses make them principals. A broker's status as a principal, an agent, or an employee depends on its relationship to other parties in a transaction, not its possession of a license.

### D.  License Revocation

■■■  Section 8(a) of PACA permits license revocation for "flagrant or repeated" violations of § 2 (7 U.S.C. § 499b). *See* 7 U.S.C. § 499h(a).[11]  The

---

tion in commerce in which two or more persons participate under a limited joint venture arrangement whereby they agree to share in a prescribed manner the costs, profits, or losses resulting from such transaction." 7 C.F.R. § 46.2(s).

**10.**  PACA defines a "broker" as "any person engaged in the business of negotiating sales and purchases of any perishable agricultural commodity in interstate or foreign commerce for or on behalf of the vendor or the purchaser, respectively, except that no person shall be deemed to be a 'broker' if such person is an independent agent negotiating sales for and on behalf of the vendor and if the only sales of

such commodities negotiated by such person are sales of frozen fruits and vegetables having an invoice value not in excess of $230,000 in any calendar year." 7 U.S.C. § 499a(b)(7).

**11.**  Subsection 499h(a) states in its entirety: "Whenever (1) the Secretary determines, as provided in section 499f of this title, that any commission merchant, dealer, or broker has violated any of the provisions of section 499b of this title, or (2) any commission merchant, dealer, or broker has been found guilty in a Federal court of having violated section 499n(b) of this title, the Secretary may publish the facts and circumstances of such violation and/or, by order, suspend the license of

Judicial Officer found JSG's bribes "willful, flagrant, and repeated violations of section 2(4) of the PACA" (7 U.S.C. § 499b(4)) and revoked its license. *See* 58 Agric. Dec. at 1094. We will not lightly disturb the Department's choice of remedy under a statute committed to its enforcement, especially given the Department's superior knowledge of the industry PACA regulates. *See Butz v. Glover Livestock Comm'n Co.,* 411 U.S. 182, 185, 93 S.Ct. 1455, 36 L.Ed.2d 142 (1973) (Upholding Department of Agriculture suspension order under the Packers and Stockyards Act and reasoning that "where Congress has entrusted an administrative agency with the responsibility of selecting the means of achieving the statutory policy[,] 'the relation of remedy to policy is peculiarly a matter for administrative competence'."); *County Produce, Inc. v. United States Dep't of Agric.,* 103 F.3d 263, 267 (2d Cir.1997) (courts "must defer to the agency's judgment as to the appropriate sanctions for PACA violations" because the Department of Agriculture "is particularly familiar with the problems inherent in the produce industry, and it has experience conforming the behavior of produce companies to the requirements of PACA").

Nothing in the record persuades us that JSG's payments to the Gentiles and Albert Lomoriello were anything but flagrant and repeated. The bribes in this case were as flagrant as those in *Goodman* and *Tipco.* The Department revoked the defendants' licenses in both cases, providing ample notice that commercial bribes may result in revocation. The only difference from those cases is that JSG apparently did not surcharge its customers to pay for the bribes. That distinction does not diminish the wilfulness of JSG's conduct or the corruption it worked on its buyers' purchasing

agents. The Department acted well within its discretion in revoking JSG's license.

 We also reject JSG's claim that the Department's denial of its motion to reopen the record was arbitrary and capricious. Some of the supplemental points JSG wished to present were not relevant to a finding of commercial bribery under *Goodman* and *Tipco.* JSG had ample opportunity before the record closed to present the others.

*Petition denied.*

---

such offender for a period not to exceed ninety days, except that, if the violation is flagrant or repeated, the Secretary may, by order, revoke the license of the offender." 7 U.S.C. § 499h(a). JSG appears to be a dealer. *See* 7 U.S.C. § 499a(b)(6) (defining "dealer" as an

entity "engaged in the business of buying or selling in wholesale or jobbing quantities, as defined by the Secretary, any perishable agricultural commodity in interstate or foreign commerce....").