# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 20, 2007                     Decided April 6, 2007

No. 06-1199

COOSEMANS SPECIALTIES, INC., ET AL.,
PETITIONERS

v.

DEPARTMENT OF AGRICULTURE AND
UNITED STATES OF AMERICA,
RESPONDENTS

———

On Petition for Review of an Order of the
Department of Agriculture

———

*Stephen P. McCarron* argued the cause and filed the briefs for petitioners Coosemans Specialties, Inc. and Eddy C. Creces.

*Martin Schulman* argued the cause for petitioner Daniel F. Coosemans.

*Stephen M. Reilly*, Attorney, U.S. Department of Agriculture, argued the cause for respondents. With him on the briefs were *James Michael Kelly*, Deputy General Counsel, and *Margaret M. Breinholt*, Assistant General Counsel.

Before: SENTELLE, RANDOLPH and BROWN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* SENTELLE.

SENTELLE, *Circuit Judge*: Wholesale produce merchant Coosemans Specialties, Inc., petitions for review of a decision by the Secretary of the Department of Agriculture to revoke the company's license for violations of the Perishable Agricultural Commodities Act. The Secretary concluded that the company violated the Act's prohibition on unfair conduct when one of its employees bribed a Department of Agriculture inspector. In addition to revoking the company's license, the Secretary also barred two principals of the company from employment in the industry. The company and the individuals seek review of the Secretary's decision, contending that bribery does not violate the Act, and that the employment restrictions were unlawful. Because we conclude that the agency's actions were proper, we deny the petitions for review.

**I.**

The Perishable Agricultural Commodities Act, 7 U.S.C. §§ 499a - 499s ("PACA" or the "Act"), was enacted in 1930 to regulate interstate and foreign commerce in fresh fruits and vegetables. The Act authorizes the agency to create a system for inspecting produce. *Id.* § 499n(a). It requires merchants to obtain licenses from the Secretary of the Department of Agriculture ("USDA" or "Secretary"), and subjects licensees to a number of requirements. *Id.* §§ 499b, 499c(a), 499e, 499i. Licensees who violate the Act may find their licenses suspended or revoked, and individuals affiliated with violators may be excluded from industry employment. *Id.* § 499h.

Petitioner Coosemans Specialties, Inc. ("CSI" or the "Company"), is a New York produce wholesaler whose PACA license was originally issued in 1986. The Company operates out of Hunts Point Terminal, a wholesale produce market in the

Bronx, New York. At all times relevant to this matter, CSI had three principals, all of whom were part owners: Daniel F. Coosemans, president and founder; Eddy C. Creces, secretary, treasurer, and general manager; and Joe Faraci, vice president.

The perishable produce that arrives at Hunts Point often travels some distance between the supplier and a buyer, such as CSI. As a result, produce may arrive in a condition worse than expected. If the buyer then asks for a price reduction, the producer is at a disadvantage, because it has no way of knowing whether to trust the buyer's representations about the condition of the produce. The USDA's inspection process is intended to level the playing field by providing the faraway producer with an independent evaluation of the produce's condition so he can be assured that the price he receives is fair. A buyer, upon receipt of nonconforming goods, may request an inspection. An agency inspector reviews the produce and issues an official certificate assessing its condition that can help the producer and buyer renegotiate the price. After their transaction is complete, however, the inspection certificate is of little use in subsequent transactions. If the initial buyer is a wholesaler like CSI, it sells the produce to another buyer who is typically able to personally inspect the produce at Hunts Point.

This inspection system has been subject to abuse. For two decades, corrupt USDA inspectors and buyers at Hunts Point participated in a scheme of illegal payments. An inspector who received a bribe might furnish a falsified certificate indicating that the produce's condition was worse than it actually was. The buyer would use that certificate to negotiate a lower price with the supplier. Once he paid the supplier, the buyer could resell the produce for a price that reflected the produce's actual condition. In this way, a buyer who bribed inspectors for this purpose could increase his profit margin to the detriment of the supplier. Additionally, some inspectors who had accepted

bribes permitted those companies to jump to the front of the line for inspections, thereby delaying the inspections of their competitors. Produce being perishable, buyers who had to wait for inspections were likely to receive lower prices when the goods were eventually resold.

In 1999, one of the Hunts Point inspectors, William Cashin, was caught taking bribes. After his arrest, he agreed to cooperate with investigators. He conducted inspections from April until August 1999 while wearing audio and/or video recording devices to document the bribes he received. During this period, he reported that he received fourteen bribes from Joe Faraci – CSI's vice president – both to hasten inspections and to falsify the resulting certificates in CSI's favor. Faraci was charged with eight counts of bribery of a public official, subsequently pled guilty to one count, and was imprisoned and fined. In light of these events, the Secretary filed a complaint against CSI on August 16, 2002, alleging that the Company, through Faraci's actions, had violated the implied duty clause of PACA's unfair practices provision. The Secretary also filed complaints against Eddy Creces and Daniel Coosemans individually, alleging that they were responsibly connected to CSI at the time the violations occurred.

The Company and both individuals denied the allegations and sought agency review. The cases were consolidated and heard in late 2003 before an Administrative Law Judge, who concluded that the Company's license should be revoked and that Creces and Coosemans, as "responsibly connected" persons, should be subject to the employment restrictions. The parties appealed to the Judicial Officer ("JO"), to whom the Secretary has delegated final authority in adjudicative proceedings. *See* 7 C.F.R. § 2.35. The JO affirmed the ALJ's initial decision in a decision and order issued April 20, 2006, finding in particular that in exchange for Faraci's bribes, Cashin would "falsify"

USDA inspection certificates by, *inter alia*, "increasing the percentage of defects" and "changing the temperatures of the load." *In re Coosemans Specialties, Inc.*, Dkt. No. D-02-0024, 2006 WL 1135512 (USDA). On June 13, 2006, CSI and the individual petitioners filed petitions before this Court seeking review of the Secretary's decision. CSI disputes the Secretary's interpretation of PACA's "implied duty" clause as encompassing a duty not to pay bribes. The individual petitioners challenge the Secretary's determination that they were subject to the employment restrictions as persons "responsibly connected" to CSI. The decision and order of the JO was stayed pending our ruling.

## II.

### A.

When reviewing an interpretation of a statute by an agency charged with the administration of that statute, we apply the two-step *Chevron* framework. *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). If the meaning of the statute is unambiguous, we must give effect to the clear congressional intent. *Id.* at 842-43. If, however, the statutory language is ambiguous, we will uphold the agency's interpretation as long as it is not "arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844. The USDA is entrusted to administer PACA, and therefore its interpretations are entitled to deference under *Chevron*. *See id.*

The Secretary's basis for revoking CSI's license is that the Company, through Faraci, violated the implied duty clause of PACA. That provision reads, in relevant part:

> It shall be unlawful in or in connection with any transaction in interstate or foreign commerce . . . [f]or

any commission merchant, dealer, or broker to make, for a fraudulent purpose, any false or misleading statement in connection with any transaction . . . or to fail or refuse truly and correctly to account and make full payment promptly in respect of any transaction . . . *or to fail, without reasonable cause, to perform any specification or duty, express or implied, arising out of any undertaking in connection with any such transaction*; or to fail to maintain the trust as required under section 499e(c) of this title. . . .

7 U.S.C. § 499b(4) (emphasis added).

CSI argues that the implied duty clause cannot fairly be read to include a duty not to bribe USDA inspectors. To do so runs contrary to a number of principles of statutory interpretation. We disagree. Initially, we note that Congress's language in this subsection is extremely broad. The word "any" appears no fewer than three times in the specific clause at issue, modifying the words "undertaking," "transaction" and "duty." *Id.* The breadth and ambiguity of the key phrase as well – "any specification or duty, express or implied" – contemplates a wide range of behavior. *See G&T Terminal Packaging Co. v. Dep't of Agric.*, 468 F.3d 86, 96 (2d Cir. 2006) ("*G&T*"); *cf.* Duties of Licensees, 7 C.F.R. § 46.26 (noting that, because it is "impracticable to specify in detail all of the duties," conduct specified in the regulations is not exhaustive). Implied duties, by their nature, would not be spelled out in a contract or otherwise; they are given meaning by agency gap-filling. *See JSG Trading Corp. v. Dep't of Agric.,* 235 F.3d 608, 614 n.8 (D.C. Cir. 2001) ("*JSG Trading II*") ("Given the substantial ambiguity in § 499b(4), it is the Department's function, not ours, to define offenses under that provision."), *quoted in G&T*, 468 F.3d at 96 (noting that, since the "statutory language plainly leaves undelineated what implied duties and specifications a

PACA licensee might be required to bear," it is the "province of the Secretary . . . to fill in these gaps"). This is especially true if the term may be better fleshed out through application of the law to specific cases and their facts, rather than by drafting an exhaustive list of all hypothetical conduct that would constitute a violation. *See INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999) (noting that an agency should be accorded *Chevron* deference "as it gives ambiguous statutory terms concrete meaning through a process of case-by-case adjudication" (internal quotation omitted)); *cf. G&T*, 468 F.3d at 97 (noting that "the expansiveness" of the implied duty clause "suggests that Congress intended to grant the Secretary broad leeway to address the infinite variety of facts and circumstances that might surround a PACA violation"). In light of these considerations, we conclude that the implied duty clause is ambiguous.

We turn next to step two of *Chevron*, in which we consider whether the agency's construction is unreasonable. *See Chevron*, 467 U.S. at 842-45; 5 U.S.C. § 706(2)(A). The section in which the implied duty clause appears is labeled "unfair conduct," and begins with the language "It shall be unlawful in or in connection with any transaction in interstate or foreign commerce . . . ." 7 U.S.C. § 499b. The section goes on to address specific types of dishonest or irresponsible conduct, such as failing to fulfill contract terms or misrepresenting material facts to another party. *Id.* § 499b(1)-(3), (5)-(7). The paragraph containing the implied duty clause also prohibits misrepresentations, late payments and failures to comply with other provisions of the Act designed to ensure financial responsibility of licensees. *Id.* § 499b(4). Petitioners argue that, since the paragraph and section deal with conduct between two parties to a particular transaction, the implied duty clause does not reach conduct relating to a third party, such as an inspector. Therefore, they argue, CSI's conduct toward an inspector – not another merchant – cannot form the basis for a violation of the

implied duty clause or any other part of the unfair practices provision.

We and other circuits have upheld the Secretary's construction of the implied duty clause as including a prohibition on commercial bribery. In those cases, one party to a transaction violates a duty to the other party when it secretly bribes the latter's agents. Commonly, a seller bribes employees of a buyer in order to ensure that the buyer remains a customer of the seller. *See, e.g., JSG Trading II*, 235 F.3d at 610-11 (affirming the Secretary's description of "a duty of produce sellers not to corrupt agents and employees of their buyers"); *JSG Trading Corp. v. Dep't of Agric.*, 176 F.3d 536, 543 (D.C. Cir. 1999) ("*JSG Trading I*") (affirming a construction of the implied duty clause to include commercial bribery); *Sid Goodman & Co. v. Dep't of Agric.*, 945 F.2d 398 (4th Cir. 1991) (per curiam) (unpublished table decision), *available in* 1991 WL 193489, at *3 (accepting as reasonable the Secretary's construction of the clause as imposing an "implied duty to deal fairly with other members in the industry," and that such duty is violated by commercial bribery); *cf. G&T*, 468 F.3d at 97 (noting that, in light of the statutory purposes, "we can hardly conceive of a duty more clearly implicated than the obligation of recipients not to make side-payments to these inspectors").

Although these cases arise under statutory law rather than the common law of contracts, the principle of contract law that requires parties to engage in honest dealing appears to have influenced how the statute was interpreted. For example, in *JSG Trading I*, we emphasized the JO's finding in *Goodman* that the payments were made without the knowledge of the employers, echoing a key factor in the mistake of fact doctrine. 176 F.3d at 542. In *Goodman* itself, the Fourth Circuit stated that the duty extended to one's competitors, even though they were not involved in the transactions at issue. 1991 WL 193489, at *4.

The bribes were a violation of the Act because each licensee has "an implied duty to deal fairly with its competitors and by paying kickbacks, Goodman's competitors were held at an unfair advantage." *Id.*; *see also JSG Trading I*, 176 F.3d at 545 (discussing, in the context of the implied duty clause, whether the "marketplace is disturbed"); *In re Tipco, Inc.*, 953 F.2d 639 (4th Cir. 1992) (per curiam) (unpublished table decision), *available in* 1992 WL 14586, at *2 (describing the duty breached by commercial bribery as, in the JO's words, a "duty of fair dealing").

The principle of honest dealing is also apparent in cases arising under the common law of contracts. For example, in *Koam Produce, Inc. v. DiMare Homestead, Inc.*, 329 F.3d 123, 127 (2d Cir. 2003), the court reviewed the Secretary's reparation award to a party who was overcharged as a result of falsified inspection certificates that the other party had obtained by bribery. The court affirmed the award on the basis of the doctrine of mistake, holding that the seller's reliance on the integrity of USDA inspections constituted a mistake of fact that adversely affected it. It noted that the mistake resulted from the informational advantage the buyer enjoyed over the seller, and that the buyer was at fault for not informing the seller of that information. *Id.* at 128; *cf. Produce Place v. Dep't of Agric.*, 91 F.3d 173, 177 (D.C. Cir. 1996) (holding that the false or misleading statement clause in § 499b(4) was violated when the buyer knowingly misrepresented the condition of the produce to the seller). These cases are consistent with the commercial bribery cases in concluding that one party breaches its duty of honest dealing when it seeks to benefit from concealing its illegal conduct that affected the contract price.

We similarly conclude that the Secretary's decision to construe the "implied duty" clause as imposing a duty to engage in honest dealing – which includes a duty not to bribe USDA

inspectors – is reasonable. It is consistent with the purposes of the Act as understood by many courts over the years: to protect producers and other merchants from dishonest and irresponsible conduct. *See, e.g., JSG Trading I*, 176 F.3d at 538; *G&T*, 468 F.3d at 97; *Chidsey v. Geurin*, 443 F.2d 584, 587 (6th Cir. 1971); *Rankin Sales Co. v. Morrie H. Morgan Co.*, 296 F.2d 113, 116-17 (9th Cir. 1961). The Company's attempt to obtain speedier and more favorable inspections gave it an advantage over its sellers, who were improperly led to believe the inspections reflected accurate, independent analyses. We see no reason why merchants' duties under § 499b(4) should be limited to cases in which the unlawful conduct is visited directly upon the other party, rather than upon a third party who has some ability to affect the transaction. The statutory language does not limit the applicability of § 499b(4) to conduct in a transaction; rather, it extends to conduct "in connection with" a transaction. We hold that the agency's interpretation of the "implied duty" clause is reasonable.

**B.**

As a result of its conclusion that CSI violated PACA, the Secretary revoked the Company's license. Petitioners advance a number of arguments why this sanction was unlawful. Generally speaking, this Court will not overturn an agency's choice of sanction unless it is "unwarranted in law" or "without justification in fact." *See Norinsberg Corp. v. Dep't of Agric.,* 47 F.3d 1224, 1227-28 (D.C. Cir. 1995) (citing *Butz v. Glover Livestock Comm'n Co.*, 411 U.S. 182, 185-86 (1973)). As this Court recently noted, "[w]e will not lightly disturb the Department's choice of remedy under a statute committed to its enforcement, especially given the Department's superior knowledge of the industry PACA regulates." *JSG Trading II*, 235 F.3d at 617.

When the Secretary determines that a licensee "has violated any of the provisions of section 499b," "the Secretary may . . . by order, suspend the license of such offender for a period not to exceed ninety days, except that, if the violation is flagrant or repeated, the Secretary may, by order, revoke the license of the offender." 7 U.S.C. § 499h(a). If, as here, the violative conduct can be sanctioned in a number of different ways under the statute, the USDA may choose the appropriate sanction by "examining the nature of the violations in relation to the remedial purposes of the regulatory statute involved, along with all relevant circumstances, always giving appropriate weight to the recommendations of the administrative officials charged with the responsibility for achieving the congressional purpose." *In re S.S. Farms Linn County, Inc.*, 50 Agric. Dec. 476, 497 (1991).

In reviewing these factors, the USDA noted that bribery undermines PACA's remedial purpose of, *inter alia*, ensuring responsible and honest dealing by merchants. CSI argues that the agency failed to consider the mitigating circumstance of widespread extortion by USDA agents that existed for many years. The agency did acknowledge, however, that the corruption at Hunts Point was a serious problem that the agency had been battling unsuccessfully for some time. Nonetheless, it concluded that bribery was such an egregious violation of the Act that severe penalties were warranted in order to deter such conduct. CSI's conduct not only gave it a competitive advantage, but it also increased the pressure on other merchants to engage in bribery to remain competitive. Even though the agency did not expressly describe the effect of the mitigating circumstances on its decision, its discussion of the circumstances that did impact its decision was sufficient to explain why the corruption among its inspectors did not warrant a lesser sanction. *Cf. Frank Tambone, Inc. v. Dep't of Agric.*, 50 F.3d 52, 56 (D.C. Cir. 1995) (upholding a sanction based on a

decision and order that did not expressly mention the mitigating factors because the JO "adequately explained why [those factors] were insufficient to exonerate the company or to render the imposition of any sanction inappropriate"). The Secretary's decision thus rested on a reasonable construction of the statute and was consistent with its sanction policy. We have no basis on which to disturb its choice of sanction.

## C.

CSI argues that, even if revocation were appropriate, the Secretary was required to give notice before imposing the sanction. The Administrative Procedure Act, 5 U.S.C. § 558(c) ("APA"), provides that, "[e]xcept in cases of willfulness," a license may not be revoked unless the licensee has been given written notice and an "opportunity to demonstrate or achieve compliance." *Id.* In this context, "an action is willful if a prohibited act is done intentionally, irrespective of evil intent, or done with careless disregard of statutory requirements." *Finer Foods Sales Co. v. Block*, 708 F.2d 774, 778 (D.C. Cir. 1983). The Secretary concluded that the willfulness exception applied because Faraci's conduct constituted a willful violation of PACA. We agree. Even though Faraci pled guilty to one count, the record indicates that he repeatedly made these payments over several months. The indictment to which he pled guilty states that he "willfully" and "knowingly" committed the act "with intent to influence official acts." Faraci admitted that when he made the payments he knew it was unlawful to do so. We have already held that the unlawful acts constituted a violation of PACA, and prior cases put CSI on notice of that fact. *Cf. JSG Trading II*, 235 F.3d at 617 (concluding that the Secretary's revocation of a PACA license in commercial bribery cases provided "ample notice that commercial bribes may result in revocation"). We thus hold that the Secretary's conclusion that the willfulness exception applied was supported by

substantial evidence that Faraci acted with at least careless disregard of the implied duty clause. APA notice, therefore, was not necessary.

**D.**

The individual petitioners challenge the Secretary's determination that they were "responsibly connected" to CSI at the time of the violations. This determination means that Coosemans and Creces cannot, for a period of time, affiliate in any way "with the business operations of a licensee, with or without compensation, including ownership or self-employment" without first obtaining permission from the Secretary. 7 U.S.C. §§ 499a(10), 499h(b). "Responsibly connected" persons include those who are "affiliated or connected with a commission merchant, dealer, or broker as . . . officer, director, or holder of more than 10 per centum of the outstanding stock of a corporation." *Id.* § 499a(9). Here, both Coosemans and Creces were 33.3% owners at the beginning of the period relevant to this matter, and became 45.5% owners in July 1999. Each is also an officer, Coosemans as president and Creces as secretary and treasurer.

Although Coosemans and Creces meet the definition of "responsibly connected" persons, a 1995 amendment to the statute permits an individual who is found to be responsibly connected to demonstrate that he is "not responsible for the specific violation." H.R. REP. NO. 104-207, at 11 (1995), *as reprinted in* 1995 U.S.C.C.A.N. 453, 458. That amendment qualified the definition of "responsibly connected" by stating that:

> A person shall not be deemed to be responsibly connected if the person demonstrates by a preponderance of the evidence that the person was not actively involved in the

activities resulting in a violation of this chapter and that the person either was only nominally a partner, officer, director, or shareholder of a violating licensee or entity subject to license or was not an owner of a violating licensee or entity subject to license which was the alter ego of its owners.

7 U.S.C. § 499a(b)(9).

Even before Congress added this provision to the statute, this Court recognized an alter ego exception to the "responsibly connected" determination that is identical to PACA's current provision. *See Norinsberg v. Dep't of Agric.*, 162 F.3d 1194, 1199 (D.C. Cir. 1998). We held that the "alter ego" exception applied to "cases in which the violator, although formally a corporation, is essentially an alter ego of its owners, so dominated as to negate its separate personality." *Id.* at 1197 (internal quotation omitted). A petitioner who was not a true owner of such a corporation would be spared the consequences of the responsibly connected determination. The amendment enacted as section 499a(b)(9) codifies this exception. This provision is plainly not applicable here because there is no claim that CSI is an alter ego rather than a formal corporation. Petitioners are required to "demonstrate[] by a preponderance of the evidence" that they fit within the nominal or alter ego exceptions. 7 U.S.C. § 499a(b)(9). As the Secretary reasonably concluded, petitioners have failed to meet this burden. We therefore affirm the Secretary's determination that Coosemans and Creces were responsibly connected to CSI and subject to the employment restrictions.

Despite petitioners' arguments to the contrary, we can find no other reason why subjecting petitioners to the employment restrictions is contrary to congressional intent. The use of absolute language in § 499h(b) describing the scope of the employment restrictions, the broad definition of employment to

include "*any* affiliation," and the inclusion of a specific exception for persons who make a certain showing – all militate against judicially created exceptions. *Id.* § 499a(b)(10) (emphasis added); *cf. Siegel v. Lyng*, 851 F.2d 412, 415-16 (D.C. Cir. 1988) (relying on the first two factors, before the provision was amended in 1995, in declining to create an exception for non-PACA job descriptions).

### III.  Conclusion

We conclude that the agency's interpretation of the "implied duty" clause as prohibiting bribery of a USDA inspector is reasonable, and that the "responsibly connected" determination is not arbitrary, capricious or contrary to law. We thus deny the petitions for review.

*So ordered.*